*376 I
En esencia, en la ponencia suplementaria del compa-ñero
Juez Asociado Señor Rivera Pérez
se indica —a modo de apología a la reciente Opinión emitida por el Tribunal en los casos de autos— que la presentación de prueba re-sultaba innecesaria para resolver la controversia sobre la constitucionalidad de la Ley Núm. 7, supra, y que procedía otorgarle deferencia a la actuación del Estado. Para sus-tentar dicha justificación, el escrito explicativo señala que en Romero Barceló v. E.L.A., 169 D.P.R. 460 (2006); Díaz Saldaña v. Acevedo Vilá, 168 D.P.R. 359 (2006) (Sentencia), y en Presidente de la Cámara v. Gobernador, 167 D.P.R. 149 (2006), este Tribunal dispuso de las controversias allí planteadas sin exigir prueba sobre la condición fiscal del país.
Basta con examinar dicha jurisprudencia para concluir lo obvio: ninguno de esos casos involucraba una controver-sia sobre la prohibición constitucional contra el menoscabo de obligaciones contractuales, como ocurrió en los casos de autos. Más bien, en aquellas ocasiones se trató de conflic-tos de poder entre las ramas políticas de nuestro Gobierno. No hubo, como sí ocurre en los casos de autos, una impug-nación de una actuación gubernamental que interviniera con los derechos constitucionales de miles de ciudadanos.
*377 De ahí que en los casos relacionados con la validez de la Ley Núm. 7, supra, opináramos que debía cumplirse con el estándar de adjudicación pautado por el Tribunal Supremo de Estados Unidos en United States Trust Co. v. New Jersey, supra, y adoptado por este Tribunal en Bayrón Toro v. Serra, 119 D.P.R. 605 (1987), a los efectos de que cuando el Estado se propone menoscabar sus propias obligaciones contractuales, debe demostrar que la medida seleccionada es razonable y necesaria. Esta evidente y fundamental dis-tinción, a nuestro pesar, no sólo se ignoró en la Opinión emitida por el Tribunal, sino que ahora, una vez más, se soslaya en el voto particular del compañero Juez Asociado Señor Rivera Pérez.
Específicamente, los pronunciamientos del referido es-crito suplementario pierden de vista que el hecho de que se haya tomado conocimiento judicial de la precaria situación fiscal, o que seamos conscientes de ésta, no releva al Es-tado de cumplir con el estándar de adjudicación de United States Trust Co. v. New Jersey, supra. La estrechez presu-puestaria que sufre el erario es innegable y, como bien se señala en el voto particular, así lo hemos reconocido en ocasiones anteriores.
No obstante, ello no implica que la medida que haya tomado el Estado para superar sus dificultades económicas cumpla con el crisol constitucional exigido ante una alega-ción de que ha mediado un menoscabo severo de obligacio-nes contractuales. Para que esto ocurra, es necesario que se demuestre que, ante la difícil situación fiscal, la medida adoptada sea necesaria; es decir, que no hayan existido otras alternativas menos drásticas. United States Trust Co. v. New Jersey, supra, págs. 30-31. Con el mayor de los respetos a los compañeros de la mayoría, a nuestro juicio, el presumir que con la existencia de una crisis fiscal se demuestra, sin más, que la alternativa seleccionada por el Estado es necesaria, constituye un razonamiento que, en *378 efecto, convierte en letra muerta la protección que ofrece la garantía constitucional contra el menoscabo de obligacio-nes contractuales.
Al emitirse la Opinión del Tribunal en los casos de epí-grafe, disentimos por entender que la mayoría de los miembros de este Foro no comprendió que el propio trá-mite judicial establecido por este Tribunal impidió la pre-sentación de prueba que demostrara que la medida tomada por el Estado era la menos gravosa. Nuestra preocupación sigue latente y la reiteramos: al no permitirles a las partes presentar prueba, se incumplieron con los parámetros de la normativa constitucional federal, lo que nos colocó al mar-gen de las garantías mínimas establecidas en la Constitu-ción de Estados Unidos sobre la prohibición contra el me-noscabo de obligaciones contractuales y, a su vez, redundó en que a los empleados públicos involucrados se les violara el debido proceso de ley.
Asimismo, la ponencia explicativa emitida en el día de hoy va aún más lejos que la Opinión certificada original-mente pues, al referirse a United States Trust Co. v. New Jersey, supra, elude la normativa allí pautada y señala in-correctamente que “el propio Tribunal Supremo federal re-conoce y postula como necesario conceder alguna deferen-cia a la actuación estatal”. Voto particular del Juez Asociado Señor Rivera Pérez, pág. 419. Según indicáramos en nuestro disenso, lo que resolvió el Tribunal Supremo de Estados Unidos en la referida jurisprudencia es que cuando el Estado adopta una medida que menoscaba sus propias obligaciones contractuales, éste debe probar ante el foro judicial que no existen alternativas menos onerosas. United States Trust Co. v. New Jersey, supra, págs. 30—31.
La mayoría de este Tribunal no sólo rehúye esa reali-dad, sino que actúa de manera inconsistente con su propia apreciación de la normativa federal al reconocer que el curso de acción por el cual optó en los casos de autos real- *379 mente descansó de manera absoluta en el juicio legislativo plasmado en la Exposición de Motivos de la Ley Núm. 7, supra. Así lo revela el propio voto particular, pues en éste se manifiesta —para que no quede duda— que la mayoría del Tribunal “auscult[ó] a la saciedad los datos y hechos constatados en la exposición de motivos que justifican las medidas que el Estado se ha visto obligado a tomar”, y que el Estado “demostró mediante los hechos y datos que sur-gen de la Exposición de Motivos de la Ley Núm. 7, que las medidas impugnadas eran razonables y necesarias”. (Én-fasis nuestro.) Voto particular, págs. 426 y 428. Fue preci-samente esta deferencia completa al juicio legislativo la que se descartó en United States Trust Co. v. New Jersey, supra, págs. 25-26, cuando el propio interés del Estado está en juego. Peor aún, en el referido escrito suplementa-rio se indica, so pretexto de una supuesta “coherencia jurí-dica”, que en los casos de autos la presentación de prueba resulta innecesaria. Voto particular, pág. 445.
Así, pues, desafortunadamente, la mayoría del Tribunal no logra entender la importancia y necesidad de que en este caso se hubiese recibido prueba para adjudicar ade-cuadamente la alegación de los empleados públicos afecta-dos de que la actuación del Estado infringe la prohibición constitucional contra el menoscabo de obligaciones con-tractuales, plasmada tanto en la Constitución del Estado Libre Asociado de Puerto Rico como en la Constitución de Estados Unidos. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1; Art. 1, Sec. 10, Const. EE. UU., L.P.R.A., Tomo 1. Con su proceder, al relevar al Estado de presentar prueba, en realidad se le privó de un foro ante el cual pudiera sos-tener su tesis de que la medida tomada era la menos drástica.

En atención a dicha alegación, luego de expedir los res-pectivos recursos de certificación, este Tribunal tenía varias alternativas. Pudo, a modo de excepción y considerando la naturaleza del caso, haber celebrado una vista evidenciaría 
*380
ante el Tribunal en pleno. Regla 4(c) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A. Pudo, además, haber designado un Comisionado Especial para que reci-biera la prueba y para que, en cumplimiento con esa enco-mienda, nos rindiera un informe que nos colocara en posi-ción de dirimir justamente las alegaciones de las partes. Regla 50 del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. XXI-A. Asimismo, pudo haber remitido los casos al Tribunal de Primera Instancia para que se desarrollara, ante ese foro, el expediente necesario para resolver la controver-sia ante nos.

Sin embargo, en los tres meses que estuvieron los recur-sos de epígrafe ante la consideración de este Foro, la ma-yoría del Tribunal no estableció procedimiento alguno para recibir la prueba correspondiente. Optó, en cambio, por despachar la controversia a base de unos expedientes lacó-nicos, a todas luces desprovistos de los elementos necesa-rios para adjudicar el asunto, pues éstos sólo consisten de las demandas, las peticiones de certificación y los alegatos de las partes. De este modo, el proceder del Tribunal cons-tituye, fundamentalmente, una violación al debido proceso de ley de los empleados públicos involucrados, pues adju-dicó y decretó la constitucionalidad de la Ley Núm. 7, supra, sin la prueba necesaria para ello, dando por ciertas unas alegaciones del Estado que nunca pudieron ser refutadas.
Adviértase, además, que al certificar los recursos de epí-grafe y obviar todo trámite posible para la presentación de prueba, el Tribunal, para efectos prácticos, convirtió las peticiones de certificación del Estado en mociones de deses-timación y así las adjudicó. Esto, a pesar de que, conforme a nuestro ordenamiento procesal, al disponer de mociones de esa índole, el tribunal debe tomar como ciertos todos los hechos bien alegados en la demanda e interpretar dichas alegaciones liberalmente y de la manera más favorable po-sible para la parte demandante. Regla 10.2 de Procedi- *381 miento Civil, 32 L.P.R.A. Ap. III; Aut. de Tierras v. Moreno Dev. Corp., 174 D.P.R. 409 (2008). Tampoco se favorece la moción de desestimación como mecanismo procesal para disponer de casos de alto interés público. íd. En los casos de autos, por el contrario, la metodología empleada por la mayoría del Tribunal fue a la inversa: tomó por ciertas las alegaciones del demandado (el Estado) en sus comparecen-cias ante nos y desestimó los reclamos de los demandantes (los empleados públicos).
De otra parte, la ponencia suplementaria tampoco nos convence sobre el intento hecho por la mayoría de este Tribunal para distinguir cómo le concedió a los ex gobernado-res un derecho vitalicio al servicio de escoltas policiacas —aún en momentos de crisis fiscal y sin la existencia de una ley que así lo estableciera— mientras que se negó a reconocerle a los servidores públicos afectados los derechos adquiridos sobre sus empleos al amparo de las leyes rela-cionadas con el sistema de personal de servicio público. Nótese que la decisión del Primer Ejecutivo en el caso de las escoltas también se tomó en el marco de una precaria situación fiscal, y respondió a la necesidad de tomar medi-das de austeridad para reducir el gasto público. Al afirmar que el gasto por el servicio de las referidas escoltas es “mí-nimo”, mientras que las cesantías impugnadas represen-tan un “ahorro sustancial” para el erario, el voto particular soslaya de forma patente la necesidad de que en ambos casos se presentara prueba. Voto particular, pág. 437.
Como expresáramos en nuestra opinión disidente, “la decisión del caso de las escoltas contrasta drásticamente con el curso de acción que adopta el Tribunal en el caso de autos. Contrario al reclamo de los ex gobernadores, el de los empleados públicos cesanteados se funda en las dispo-siciones expresas de un ordenamiento que les garantiza el principio de mérito en el servicio público y les otorga dere-chos propietarios. No podemos avalar que ante el reclamo de sus derechos, no sólo adquiridos, sino expresamente *382 conferidos por ley, se adopte un criterio distinto al pautado en el caso de las escoltas de los ex gobernadores”. Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 108—109 (2010), opinión disidente del Juez Presidente Señor Hernández Denton. Reafirmamos, además, nuestro criterio de que el proceder del Tribunal “priva a los empleados públicos afec-tados de sus derechos adquiridos sin tan siquiera haberles provisto un proceso judicial completo y transparente, lo que lamentablemente tendrá el efecto de socavar la legiti-midad de la decisión de este Tribunal y contribuirá a crear aún más desconfianza sobre la sabiduría y la validez de la acción tomada por el Estado para resolver sus problemas fiscales”. íd., pág. 110.
II
En fin, reiteramos los pronunciamientos emitidos en nuestra opinión disidente del pasado 2 de febrero de 2010 sobre los efectos contraproducentes que tuvo el trámite judicial apresurado de los casos de epígrafe en la adjudica-ción de la constitucionalidad de la Ley Núm. 7, supra. En particular, el curso de acción procesal seguido en estos ca-sos por una mayoría del Tribunal no permitió la presenta-ción de prueba ante el foro de instancia. Tampoco se diseñó mecanismo alguno para que, en su defecto, esta Curia re-cibiera dicha prueba. Así, al presumir como ciertas las ale-gaciones del Estado según fueron consignadas en la Expo-sición de Motivos de la Ley Núm. 7, supra, sin permitir que éstas fueran sustentadas adecuadamente por el Estado ni refutadas por los demandantes, se colocó a la parte afec-tada —los empleados públicos— en un estado de indefensión. Ello ejemplifica el tipo de actuación que nues-tro estado de derecho siempre ha pretendido evitar: la toma de decisiones judiciales en clara contravención a las garantías mínimas del debido proceso de ley.
En vista de ello, y reexaminadas las peticiones de certi- *383 ficación, los alegatos de las partes, la Opinión del Tribunal y el voto particular del compañero Juez Asociado Señor Rivera Pérez, reafirmamos los criterios expuestos en nues-tra opinión disidente. Advertimos, además, que con el pro-ceder de la mayoría del Tribunal continuamos al margen de la normativa establecida por el Tribunal Supremo de Estados Unidos en United States Trust Co. v. New Jersey, supra, caso que rige la presente controversia.
— O —
Voto particular del
Juez Asociado Señor Rivera Pérez,
al que se unen los Jueces Asociados Señor Martínez Torres, Señor Kolthoff Caraballo y la Jueza Asociada Se-ñora Pabón Charneco.
La controversia ante nos no comenzó con la aprobación de la Ley Núm. 7 de 9 de marzo de 2009. Gira alrededor de un período de tiempo de cinco años; esto es, los presupues-tos de los años 2005-2006, 2006-2007, 2007-2008, 2008-2009 y 2009-2010. La presente controversia está relacio-nada con tres casos atendidos y resueltos previamente por este Tribunal, a saber: Presidente de la Cámara v. Gobernador, 167 D.P.R. 149 (2006); Díaz Saldaña v. Acevedo Vilá, 168 D.P.R. 359 (2006), y Romero Barceló v. E.L.A., 169 D.P.R. 460 (2006). Veamos cómo este Tribunal ha aten-dido durante esos años el asunto y las controversias surgi-das alrededor de la crisis fiscal de la Rama Ejecutiva.
I
El 30 de junio de 2005 la Asamblea Legislativa aprobó la Resolución Conjunta de la Cámara Núm. 445, que con-tenía el Presupuesto General de Gastos del Gobierno de Puerto Rico proyectado para el año fiscal 2005-2006. Al día siguiente, esta pieza legislativa fue presentada al Gober- *384 nador para su evaluación correspondiente. El Gobernador vetó en su totalidad, por inacción, tal medida según esta-blece el Art. Ill, Sec. 19 de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. Como conse-cuencia, se activó el Art. VI, Sec. 6 de nuestra Constitu-ción, L.P.R.A., Tomo 1. Esto es, las partidas de gastos con-signados en el Presupuesto General para el año fiscal 2004-2005, contenidas en la Resolución Conjunta de la Cá-mara Núm. 927 de 30 de junio de 2004 (R.C. Núm.927), continuaron rigiendo para el año fiscal 2005-2006.(1)
El Gobernador, Hon. Aníbal Acevedo Vilá, aprobó la Or-den Ejecutiva Núm. 58 de 30 de agosto de 2005, Boletín Administrativo Núm. OE-2005-58, decretando ciertos ajus-tes a los desembolsos con cargo al Fondo General para el año fiscal 2005-2006. La referida Orden Ejecutiva disponía que “los recursos disponibles para el año fiscal 2005-2006 no basta[ban] para cubrir las asignaciones presupuestarias vigentes”. (Enfasis suplido.)(2) Para balancear el presu-puesto de ese año fiscal el Gobernador, Hon. Acevedo Vilá, entendió que había que reducir el presupuesto de la Cá-mara de Representantes por $6 millones menos que lo asignado para el mismo propósito mediante la R.C. Núm. 927; el presupuesto del Senado por aproximadamente $4,500,000 menos que lo asignado por la referida Resolu-ción Conjunta, y la partida correspondiente a las Activida-des Conjuntas de la Asamblea Legislativa fue reducida aproximadamente a la mitad. La R.C. Núm. 927 proveía $21,600,000. Por tal concepto fue reducido a $10,780,000.(3)
Ambos Presidentes de las Cámaras Legislativas y la Su-perintendente del Capitolio presentaron sendas acciones ante el Tribunal de Primera Instancia para solicitar que se dictara sentencia declaratoria e injunction contra el Gober- *385 nador, Hon. Acevedo Vilá, el Secretario de Hacienda y la Directora de la Oficina de Gerencia y Presupuesto. Alega-ron que el Gobernador había violado el Art. VI, See. 6 de nuestra Constitución, supra, y el principio de separación de poderes. Solicitaron que se declarara inconstitucional la actuación del Gobernador y que se le ordenara certificar como disponible para el año fiscal 2005-2006 un presu-puesto idéntico al del año fiscal anterior, hasta que se apro-bara un nuevo presupuesto. El Tribunal de Primera Ins-tancia, Sala Superior de San Juan, consolidó las acciones de la Cámara de Representantes y de la Superintendente del Capitolio.(4) La acción del Senado fue atendida por otra Sala Superior de San Juan del foro primario.(5)
En el caso consolidado de la Cámara y la Superinten-dente del Capitolio, el Gobernador, Hon. Acevedo Vilá, pre-sentó ante el Tribunal de Primera Instancia una “Moción en Solicitud de Sentencia Sumaria a Favor de los Funcio-narios Demandados”. En dicho escrito alegó, como hecho incontrovertido, que mediante la ya mencionada Orden Ejecutiva realizó ajustes a los desembolsos de fondos auto-rizados con cargo a las asignaciones de la Cámara de Re-presentantes a $41,000,000 para el año fiscal 2005-2006. Adujo, también, que el contexto histórico en el que se des-envuelve el caso reúne dos eventos noveles: la falta de aprobación de asignaciones presupuestarias para un año fiscal; “y la existencia de un presupuesto deficitario”. Sobre este último, el Gobernador aludió en varias ocasiones a la existencia de una situación deficitaria crítica. Más aún, se-ñaló que “[1] a Asamblea Legislativa no puede pretender ex-cluirse del grave problema fiscal que afronta el Gobierno arguyendo que cualquier ajuste que se realice en los des-embolsos con cargo a sus asignaciones debe ser vedado”. (Enfasis suplido.)
El Tribunal de Primera Instancia, Sala Superior de San *386 Juan, por voz del Hon. Juez Carlos S. Dávila Vélez, dictó sentencia sumaria y declaró “con lugar” ambas acciones. El foro primario resolvió que la actuación del Gobernador, Hon. Acevedo Vilá, era ilegal por violar la doctrina de se-paración de poderes y por constituir una concentración de poder indebida en la Rama Ejecutiva, la cual no surge ex-presamente de la Constitución. Por ello, emitió un injunction permanente en contra de los demandados para que cesaran y desistieran de reducir unilateralmente las parti-das presupuestarias vigentes de la Legislatura. Insatisfe-cho, el Gobernador acudió ante el Tribunal de Apela-ciones.(6)
Por su parte, en el caso del Senado, luego de la vista oral argumentativa, el Tribunal de Primera Instancia le ordenó al Gobernador, Hon. Acevedo Vilá, que sometiera un escrito exponiendo su posición sobre el recurso. El Go-bernador presentó un escrito intitulado “Moción de suma-ria a favor de los funcionarios”. Allí, alegó como hecho in-controvertido, inter alia, que “los recursos disponibles para el año fiscal 2005-2006 no eran suficientes para cubrir las asignaciones presupuestarias que habían quedado o adve-nido vigentes; que a raíz de esa situación deficitaria, y de las necesidades apremiantes e intereses del servicio”. El Go-bernador aprobó la Orden Ejecutiva Núm. 58, mediante la cual ajustó los desembolsos de fondos que se hacen con cargo a las asignaciones del Fondo General vigentes para el año 2005-2006. De esa manera pretendió ajustar los des-embolsos con cargo a la partida correspondiente a la Asam-blea Legislativa en $10,780,000 para el año fiscal 2005-2006.
El Tribunal de Primera Instancia, Sala Superior de San Juan, por voz del Hon. Oscar Dávila Suliverez, Juez, dictó sentencia sumaria a favor del Gobernador y demás funcio-narios demandados y contra el Senado. “Concluyó, que ante un déficit presupuestario, el Primer Ejecutivo no podía au- *387 torizar el desembolso de todos los gastos para el funciona-miento del Gobierno, sino que estaba obligado a procurar que el presupuesto general estuviese balanceado, y debía atender los intereses del servicio y las necesidades apre-miantes del País, según disponen las Sees. 6,7 y 8 del Art. VI de nuestra Constitución y la Sección 2 de la R.C. Núm. 927 .... [Concluyó] que el Gobernador podía ajustar las asignaciones presupuestarias del Senado sin que ello vul-nerara la doctrina de separación de poderes.” (Enfasis suplido.)(7)
Nótese, sin embargo, que en ambos casos el Tribunal de Primera Instancia determinó como hecho incontrovertido la existencia de una crisis fiscal en la Rama Ejecutiva. En el caso de la Cámara de Representantes señaló palmaria-mente: “[e\sta es una crisis que debe ser enfrentada por las tres ramas”, mientras que en el caso del Senado de Puerto Rico el foro primario indicó que “[Z]os recursos disponibles, según estimados por la Rama Ejecutiva para el Año Fiscal [sic] 2005-2006, no son suficientes para cubrir las asigna-ciones presupuestarias que han quedado o advenido vigen-tes .... Los ingresos no son suficientes para costear los gas-tos del presupuesto de este año.” (Enfasis suplido.)
Así las cosas, se solicitó ante nos la certificación de am-bos casos (tres causas de acción de autos)(8) y acordamos expedir. Concluimos que ambos casos tenían cuestiones si-milares de hechos y de derecho. Todas las partes presenta-ron sus alegatos.
Nuevamente, en su alegato ante nos, el entonces Gober-nador, Hon. Acevedo Vilá, alegó en síntesis, que existía un déficit presupuestario y que por tal razón tenía la obliga-ción de cuadrar el presupuesto para atender las necesida-des del País. En apoyo de su contención, argüyó que existía un estado de alarma debido a una crisis económica donde la economía de Puerto Rico y su crédito se encontraban en *388 peligro porque la Legislatura no le aprobó el presupuesto necesario. También, destacó que era de conocimiento general que el Gobierno de Puerto Rico hubiese acumulado a través de varias décadas un déficit estructural que sobre-pasa mil millones de dólares.
El 19 de diciembre de 2005, el Gobernador, Hon. Acevedo Vilá, solicitó el desistimiento del recurso de certifica-ción que él presentara y la desestimación del recurso de la misma naturaleza presentado por el Senado por ser ambos recursos, alegadamente, académicos. Las Cámaras Legis-lativas y la Superintendente del Capitolio se opusieron a tal petición. (9)
El Gobernador, Hon. Acevedo Vilá, promulgó, el 16 de diciembre de 2005, una Orden Ejecutiva, Boletín Adminis-trativo OE-2005-78, reponiendo la cantidad de dinero que originalmente redujo a los presupuestos de la Asamblea Legislativa. Con tal actuación revirtió los efectos de su Or-den Núm. 58, la cual creó la referida controversia. El Go-bernador alegó, para sostener su argumento de academici-dad de ambos recursos de certificación, que tres meses y dieciséis días después de haber emitido la Orden Ejecutiva Núm. 58, los recaudos del Gobierno habían sobrepasado las proyecciones de ingresos estimados para el año fiscal 2005-2006. Informó que dicho aumento de los ingresos se debió a la creciente actividad económica y a las medidas implementadas sobre fiscalización gubernamental.(10)
Sobre tal asunto concluyó este Tribunal que “ya la Asamblea Legislativa no requiere nuestra intervención para procurar la reposición de sus presupuestos. Además, parece evidente que la condición fiscal del País no es la misma que existía cuando el Gobernador decidió reducir los aludidos presupuestos. Es decir, la controversia que llegó ante nosotros ya no es un obstáculo legal ni práctico para el normal desenvolvimiento de ambas ramas políticas *389 de nuestro Gobierno”. Añadió este Tribunal, que “debido a las particularidades de la controversia que se nos presentó, entendemos que no existe una probabilidad razonable de [sic] vuelva a repetirse. Es decir, su recurrencia requeriría que existiera un tranque en el proceso de formulación y aprobación del presupuesto, en circunstancias de crisis fiscal, y que el Primer Mandatorio vuelva a reducir unilate-ralmente los presupuestos de otra Rrama [sic] del Gobierno. En el pasado siglo nunca se nos presentó un trasfondo fáctico análogo. Resulta, pues, muy especulativo concluir que una controversia idéntica a ésta volverá a suscitarse”. (Énfasis suplido.)(11)
Este Tribunal concluyó en tal forma, a pesar de que el Gobernador, Hon. Acevedo Vilá, alegó inicialmente que la crisis fiscal de la Rama Ejecutiva se debía, en parte, a que la Rama Legislativa no le había aprobado un presupuesto para el año fiscal 2005-2006, y que posteriormente, al soli-citar el desistimiento y desestimación de los referidos re-cursos de certificación, se contradijo, cambió diametral-mente su posición y argüyó que los recaudos del Gobierno habían sobrepasado las proyecciones de ingresos estimados para ese mismo año fiscal 2005-2006.(12) Este Tribunal no exigió prueba alguna al entonces Gobernador para soste-ner su nueva postura.
El Tribunal razonó lo siguiente: “pesa sobre nuestro análisis el hecho de que la ocasión no es la propicia para un pronunciamiento nuestro.”(13) Concluyó que “[l]a situación gubernamental actual amerita que estas Ramas trabajen en conjunto para resolver asuntos de mayor trascendencia e importancia para el bienestar del pueblo de Puerto Rico. El proceso político debe continuar su cauce”.(14) Le impar-tieron total y absoluta deferencia al referido proceso reali-zado por las ramas políticas del gobierno.
*390 Este Tribunal concluyó, además, en aquella ocasión que “[é\n ausencia de circunstancias que ameriten la interven-ción judicial, no estamos en posición de emitir directrices con el propósito de guiar al Ejecutivo y al Legislativo en la encomienda que los electores le han delegado para los años restantes de este cuatrienio. Todas estas consideraciones ameritan nuestra prudencia y abstención en estas circuns-tancias no aptas para le intervención judicial”. (Énfasis suplido.)(15)
Así pues, este Tribunal anuló los autos de certificación expedidos en los casos de Hon. José Aponte Hernández v. Hon. Aníbal Acevedo Vilá y otros, CT-2005-6, y Senado de Puerto Rico v. Hon. Aníbal Acevedo Vilá y otros, CT-2005-08, y ordenó su archivo.(16) El entonces Juez Asociado Se-ñor Fuster Berlingeri concurrió por escrito. Disentimos sin opinión escrita. La Juez Asociada Señora Rodríguez Rodrí-guez disintió con opinión escrita.
La distinguida Juez Asociada Señora Rodríguez Rodrí-guez disintió de la determinación de la mayoría de deses-timar por académicos ambos recursos de certificación por la actuación unilateral del Gobernador, Hon. Acevedo Vilá, de cesar la conducta que originalmente dio base al litigio y restaurarle el presupuesto a las Cámaras Legislativas y a la Superintendencia del Capitolio. Su inconformidad se asentó sobre la ausencia de garantía de que el entonces Go-bernador no habría de incurrir en la misma conducta en el futuro.(17)
No había garantía de que el Gobernador, Hon. Acevedo Vilá, no repitiera tal actuación porque este Tribunal no le exigió la presentación de prueba para sostener su moción de desistimiento y de desestimación por ser alegadamente académicos ambos recursos de certificación. No le exigió la presentación de prueba sobre su alegación de que “los re- *391 caudos del Gobierno habían sobrepasado las proyecciones de ingresos estimados para el año fiscal 2005-2006”. Esta prueba era vital para que este Tribunal se asegurara de que no iba a repetirse esta controversia en un futuro. No obs-tante, este Tribunal se conformó con aceptar como cierta sólo la alegación del entonces Gobernador, Hon. Acevedo Vilá, basada en su Orden Ejecutiva del 16 de diciembre de 2005, desnuda de prueba alguna. A la mayoría le satisfizo y entendió como “evidente” la alegación de que la condición fiscal del Gobierno no estaba en crisis, en clara y abierta contradicción con lo dictaminado poco tiempo antes por los Jueces Superiores, Hon. Dávila Vélez y Hon. Dávila Suli-veres, como hecho incontrovertido y a solicitud del propio Gobernador, Hon. Acevedo Vilá, de que existía una deficien-cia fiscal en el presupuesto del año 2005-006. No exigió prueba de la veracidad de tal alegación para concluir como lo hizo e indicar que la referida controversia no era un obs-táculo para el normal funcionamiento de la Rama Ejecutiva. No le exigió al entonces Gobernador la presen-tación de prueba de que la referida controversia se hubiere disuelto y no iba a repetirse porque la Rama Ejecutiva con-taba con los recursos económicos necesarios para su normal funcionamiento y la prestación de servicios a la ciuda-danía.
No obstante, los disidentes de aquel momento, el que suscribe y la Juez Asociada Señora Rodríguez Rodríguez, no señalaron que los servicios gubernamentales a los que tiene derecho la ciudadanía y a ser prestados por la Rama Ejecutiva merecían de “un Tribunal que examinara a caba-lidad sus planteamientos de acuerdo con la prueba que en su momento se presentara, y no que se atendieran sus re-clamos mediante una decisión que valida, cual sello de goma, los argumentos del Estado”. (Enfasis suplido.)(18) La falta de constancia de la mayoría en aquel caso tampoco *392 produjo en el ánimo de los disidentes de entonces el “enten-der —tal vez— cuando, desde la orilla, observamos el flujo y reflujo de la marea”,(19) refiriéndose a los miembros y compañeros de funciones de la mayoría. Tampoco le adscri-bieron a éstos “despreocupación” de que la ciudadanía no recibiera los servicios públicos a que tiene derecho de la Rama Ejecutiva.
La actuación de este Tribunal de anular los referidos autos de certificación, oportuna y debidamente expedidos, produjo la indeseable anomalía de dejar sin revisión judicial dos dictámenes del Tribunal de Primera Instancia, Sala Superior de San Juan, a través de dos de sus jueces, totalmente contradictorios sobre un mismo asunto y con-troversia de hecho y de derecho.
La claudicación de este Tribunal de su ministerio, deber y obligación constitucional por su falta de intervención en ese caso, junto a otras acciones de la Rama Ejecutiva que no es propio de nosotros analizar, dio margen al inicio de la más grave crisis fiscal que vive Puerto Rico en la actuali-dad, que está directamente relacionada con muchos de los asuntos que actualmente nos enfrentamos en el caso ante nos y que las opiniones disidentes de hoy postulan que re-quieren en la actualidad de la presentación de prueba. Muy respetuosamente no compartimos tal criterio. Sin embargo, en ese caso del pasado cuando era imprescindible la presentación de prueba, como explicamos previamente, la mayoría de entonces no lo hizo, sin ocurrírsele, repetimos, a ninguno de los disidentes de entonces adscribirle a aque-lla mayoría que fungían “cual sello de goma” del Ejecutivo o que actuaban en forma “despreocupada” ante las necesi-dades de cientos de miles de ciudadanos.
La mayoría declinó su jurisdicción en ese caso cuando era necesario delimitar los contornos de la Constitución del Estado Libre Asociado de Puerto Rico en cuanto a los pode- *393 res del Gobernador para conjurar los graves problemas fis-cales de la Rama Ejecutiva. Las actuaciones del entonces Gobernador afectaban directamente el funcionamiento y operación de la Legislatura, que es, según nuestro es-quema constitucional democrático, la rama de gobierno donde se formula la política pública que convierte en rea-lidad las aspiraciones del Pueblo de Puerto Rico, plasma-das en las elecciones generales. Las actuaciones del enton-ces Gobernador también afectaron directamente el principio de gobierno representativo que es el eje de nues-tro sistema legislativo, interviniendo impropia e indebida-mente con el mandato democrático expresado en las urnas, de acuerdo con los valores de esa voluntad colectiva y con el bienestar de cientos de miles de puertorriqueños.
II
El 26 de abril de 2006 el Gobernador, Hon. Acevedo Vilá, emitió su Orden Ejecutiva Núm. 10, Boletín Administra-tivo OE-2006-10, para exponer que “a pesar de los esfuer-zos realizados por la Rama Ejecutiva, los fondos estimados disponibles para cerrar el año fiscal 2005-2006 resultarían insuficientes para cubrir las operaciones del Gobierno para dicho periodo, según había informado el Secretario de Hacienda”.(20) Sostuvo que, de continuar efectuándose de manera corriente los desembolsos correspondientes a todas las entidades que se nutrían del Fondo General, era inmi-nente el cierre del Gobierno antes de que culminara el año fiscal 2005-2006.(21) Expresó que resultaba indispensable mantener un nivel mínimo de funcionamiento guberna-mental que incluyera la operación de los elementos esen- *394 cíales de las agencias de seguridad y de salud públicas, de manera que se pudiera preservar la razón de estado, la salud y la seguridad del pueblo.(22)
El Gobernador, Hon. Acevedo Vilá, instruyó al Secreta-rio de Hacienda a autorizar los desembolsos con cargo al Fondo General de acuerdo con determinadas directrices in-corporadas en la referida Orden Ejecutiva. Ordenó que se le desembolsara a la Oficina del Contralor de Puerto Rico sólo el setenta y cinco por ciento de los gastos de nómina proyectados para mayo y junio de 2006. Le redujo en igual proporción los demás gastos operacionales para el mismo periodo. (23)
El 28 de abril de 2006 el Contralor presentó un recurso de mandamus ante nos contra el Gobernador y el Secreta-rio de Hacienda a escasamente dos meses y medio de ha-berse resuelto el caso de Presidente de la Cámara v. Gober-nador, supra. En su recurso, el Contralor adujo, esencial-mente, que el Gobernador no tenía la facultad constitucio-nal ni legal para reducir el presupuesto de su oficina, ya que operaba por mandato constitucional de forma indepen-diente de la Rama Ejecutiva.(24) Los demandados solicita-ron la desestimación de la petición de mandamus presen-tada por el Contralor. Adujeron que la controversia era prematura debido a que el proceso político estaba en busca de soluciones a la crisis gubernamental, siendo ésta, ade-más, una cuestión política que no era susceptible de ser resuelta por los tribunales. Alegaron que el Contralor no tenía la capacidad legal ni la legitimación activa para ins-tar el referido recurso.(25)
Durante los trámites de este caso, el Contralor identi-ficó la causa u origen de la crisis fiscal determinada por el Tribunal de Primera Instancia, como hecho incontrover- *395 tido, en el caso anterior.(26) Determinación similar realizó este Tribunal en el caso de la Oficina del Contralor que estamos relacionando.(27) Sobre tal asunto, expresó el Con-tralor, que el Gobernador, Hon. Acevedo Vilá, estaba facul-tado y obligado a hacer los ajustes necesarios en la Rama Ejecutiva para que los desembolsos no sobrepasaran los fondos públicos disponibles para el año fiscal 2005-2006. El Contralor formuló ciertas y determinadas interrogantes sobre tal asunto. ¿Cuándo es que el Gobernador estaba obligado a hacer tales ajustes en la Rama Ejecutiva? ¿Cuándo era inminente que se habrían de agotar los fondos públicos en esa rama de gobierno? Afirmó que era de cono-cimiento público que el Gobernador anunció muy temprano durante el transcurso del año fiscal 2005-2006 que ya divi-saba ese escenario en la Rama Ejecutiva. Sostuvo que en ese momento existían dos cursos de acción como alternativas. Primero, comenzar un proceso ordenado de recorte de gastos en la Rama Ejecutiva. Segundo, confiar en que en algún momento se aprobarían medidas de recau-dos adicionales. Afirmó que el Gobernador descansó en la segunda opción. Sostuvo que la prudencia y la Constitu-ción del Estado Libre Asociado de Puerto Rico requerían que se recurriera desde entonces a la alternativa de un recorte ordenado de gastos en la Rama Ejecutiva. Afirmó que no debió producirse nunca lo que vivimos, un gobierno parcialmente cerrado. Puntualizó que el proceso político, en aquel momento en marcha en la Rama Legislativa, fue el resultado de acciones u omisiones que se arrastraban, por lo menos, desde el comienzo del año fiscal 2005-2006. Sostuvo que el exceso en los gastos de la Rama Ejecutiva sobre los presupuestados y sobre los estimados de ingresos de esa rama de gobierno durante el año fiscal 2005-2006, fue sometido al foro político porque no se atendió adecua-damente como correspondía. El Contralor opinaba que el *396 origen de tal exceso era la falta de control de los gastos de la Rama Ejecutiva, en previsión de una negativa legisla-tiva a aprobar legislación para allegar recaudos adicion-ales.
El 8 de mayo de 2006, el entonces Gobernador y los Presidentes de los cuerpos legislativos designaron una Co-misión Especial como parte de la búsqueda de soluciones a los graves problemas fiscales y presupuestarios de la Rama Ejecutiva. Esta Comisión Especial rindió un informe con sus recomendaciones el 10 de mayo de 2006. Como conse-cuencia, los cuerpos legislativos aprobaron diversas medi-das legislativas durante ese mes y año para atender la si-tuación económica de la Rama Ejecutiva, las cuales fueron firmadas por el Gobernador. (28)
En vista de toda la legislación aprobada, de los aconte-cimientos suscitados entre la Rama Ejecutiva y Legislativa después del inicio de este caso, de “los problemas fiscales que atraviesa el Gobierno del Estado Libre Asociado de Puerto Rico” y por la naturaleza discrecional del recurso de mandamus, este Tribunal, una vez más, declinó ejercer su jurisdicción en este asunto y denegó la expedición del auto de mandamus solicitado. Claudicó nuevamente su ministe-rio de delinear los contornos de nuestra Constitución de-bido a las referidas actuaciones del Gobernador frente a una crisis fiscal tan seria que estaba creciendo y desarro-llándose sin normas claras que delimitaran las limitacio-nes que tenía el Poder Ejecutivo ante tal situación.
No obstante, el Tribunal, en ese caso, tomó conocimiento *397 judicial de que al ser aprobada la Ley para el Financia-miento del Déficit Gubernamental del 2006 y la Resolución Conjunta Núm. 119, entre otras piezas legislativas, “cesa-ron aquellas razones aducidas por el Gobernador en su Or-den Ejecutiva para ordenar el desembolso limitado de los gastos de la Oficina del Contralor” .(29) Además, tomó cono-cimiento judicial de que a partir de la aprobación de estas medidas, el Gobierno de Puerto Rico “recibió los fondos ne-cesarios para continuar sus operaciones en la última etapa del año fiscal 2005-2006”. (30) Por tal motivo, el Tribunal concluyó que la revisión de la Orden Ejecutiva solicitada por el Contralor perdió su eficacia por sus propios términos porque dicho funcionario había obtenido el remedio que nos solicitó.(31) Una vez más este Tribunal no consideró que la conducta del Gobernador se había repetido según lo ha-bía anticipado la Juez Asociada Señora Rodríguez Rodrí-guez en el caso anterior. (32) Declinó ejercer su jurisdicción para interpretar los contornos de nuestra Constitución y delimitar la frontera y las limitaciones del Poder Ejecutivo para lidiar con su evidente crisis presupuestaria. El Tribunal le impartió, repetimos, total, completa, absoluta y ciega deferencia al proceso realizado por las ramas políticas de gobierno sin exigir un ápice de prueba.
Este Tribunal declinó ejercer su jurisdicción en ese asunto a pesar de que el Gobernador, Hon. Acevedo Vilá, había recurrido en su conducta al violar nuevamente el principio de separación de poderes. Así procedió, sin garan-tía alguna de que no se habría de repetir tal conducta y en ausencia de presentación de prueba por el Gobernador so-bre la suficiencia de fondos de la Rama Ejecutiva, como consecuencia de las medidas legislativas tomadas para resolver en el futuro la crisis fiscal de la Rama Ejecutiva. *398 Este Tribunal se conformó y aceptó, en aquel momento, que se había resuelto la insuficiencia de fondos de la Rama Ejecutiva para los meses de mayo y junio de 2006, sin in-dagar ni exigir garantías de que las actuaciones del Gober-nador no se repetirían durante la aprobación de presu-puestos futuros durante ese cuatrienio ante el escenario político de un gobierno compartido. En aquel momento fue-ron suficientes sólo las alegaciones del Gobernador y las exposiciones de motivos, contenido y propósito de las referi-das piezas legislativas. No obstante, no se nos ocurriría imputar a la mayoría de entonces que actuaban “cual sello de goma”(33) del entonces Gobernador, mucho menos que esa mayoría no hubiera cumplido “con [nuestra] función judicial constitucional de adjudicar controversias de forma mesurada y con justificación jurídica”. (Enfasis suplido.)(34) Ese no es nuestro estilo por el profundo respeto que nos inspira nuestra institución y el principio de colegiación al amparo del cual operamos, por virtud de lo cual, entende-mos muy respetuosamente que el Pueblo espera mucho más de nosotros.
El Juez Asociado Señor Fuster Berlingeri emitió una opinión de conformidad. La Juez Asociada Señora Rodrí-guez Rodríguez concurrió sin opinión escrita. Emitimos opinión disidente.
Expresamos en nuestra opinión disidente, como cues-tión de umbral, que la mayoría procedió a denegar el re-curso, nuevamente, por académico. Aunque no utilizaron, expresamente, como fundamento tal doctrina, su razona-miento quedó allí enmarcado. La mayoría de entonces sos-tuvo que no debía expedirse el auto solicitado para resolver una controversia que ya había sido resuelta por la Rama Ejecutiva y la Legislativa. Ciertamente, el proceso político entre la Rama Legislativa y la Ejecutiva, dirigido a crear fuentes de recaudo adicionales para el año fiscal 2005-2006 *399 había concluido. No obstante, tal controversia era distin-guible de la presente. La primera quedó enmarcada como una cuestión política, la nuestra contenía un asunto justi-ciable de alto interés público. La mayoría puntualizó, en esa ocasión, que dicho tipo de recurso sólo había de expe-dirse “en circunstancias extraordinarias” cuando el balance de los intereses involucrados amerita la intervención del foro judicial. Sostuvo la mayoría de entonces que aquel caso no contenía tales circunstancias.(35) Discrepamos de tal criterio y curso de acción.
Expresamos, en aquel momento, que el asunto relacio-nado con la intervención impropia e indebida del entonces Gobernador de Puerto Rico con los fondos públicos asigna-dos por estatuto a la Oficina del Contralor, estaba pre-sente, tenía vigencia y estaba vivo. Conducta de tal natu-raleza fue observada por el entonces Gobernador en forma recurrente y repetitiva, incurriendo en acciones muy serias y graves, violatorias al esquema democrático constitucional vigente. El Gobernador de Puerto Rico no tiene el poder ni la facultad para enmendar, mediante una orden ejecutiva, una ley vigente que está constitucionalmente obligado a cumplir y hacer cumplir. Está impedido de incurrir en tal actuación para intervenir con los fondos asignados por dis-posición legislativa a la Oficina del Contralor para sufra-gar sus gastos de operación. (36) El cuadro presente en aquel caso contenía las “circunstancias extraordinarias” que re-quiere nuestro ordenamiento jurídico para que la interven-ción de este Tribunal fuera imprescindible. La “prudencia y la experiencia” es el fundamento principal para hacer man-datoria la intervención de este Tribunal para proteger y garantizarle a nuestro pueblo “los mejores intereses de la justicia y la democracia”.
Al no intervenir este Tribunal en aquel asunto, claudicó a su ministerio de proteger y garantizarle al Pueblo su *400 democracia frente a la crisis constitucional más grave y seria de su historia.(37)
Sobre el tema del recurso de mandamus indicamos lo siguiente:
Por tratarse de un auto “altamente privilegiado”, los tribuna-les tienen necesariamente que medir la totalidad de las cir-cunstancias presentes, tanto al determinar si debe o no expe-dirse el auto, como también al fijar el contenido de su disposición, de haberlo expedido. El remedio se concede sólo cuando el tribunal está convencido de que con ello se cumpli-rán propósitos de utilidad social e individual. Es indispensable estimar los efectos que tendrá la intervención judicial en el adecuado cumplimiento de las responsabilidades y los deberes del funcionario afectado, al amparo de la Constitución de Puerto Rico y de la ley. Resulta imperativo buscar el más fino “balance y equilibrio” entre los diversos intereses en conflicto.
Este Tribunal tiene la obligación de tomar en cuenta, al mo-mento de considerar un recurso como el presente, el velar y proteger los intereses públicos que puedan ser perjudicados con la expedición del auto solicitado. Tiene el deber ineludible de proteger y garantizar nuestra forma republicana de go-bierno, evitando una intromisión indebida de la Rama Judicial con los procesos de las ramas políticas de gobierno. El criterio que gobierna el asunto ante nos consiste en el impacto que la expedición del auto solicitado y nuestra intervención pudiera tener sobre el interés público inmanente del esquema demo-crático de la Constitución de Puerto Rico. Este recurso sí pre-senta las “circunstancias extraordinarias” que requiere nuestro ordenamiento jurídico para que la intervención de este Tribunal sea imprescindible. La experiencia vivida en dos ocasiones, relativa a alegadas actuaciones iguales o similares del Gober-nador nos obliga, como medida prudencial, a intervenir para proteger y garantizar “los mejores intereses de la justicia y la democracia”. Nuestra intervención en este asunto resulta im-prescindible por razón de utilidad social e individual, por la importancia y relevancia que tiene para nuestro sistema cons-titucional de gobierno democrático. Nuestra intervención re-sulta mandatoria ante el reiterado incumplimiento del Gober-nador con sus deberes y obligaciones ministeriales, al amparo *401 de la Constitución de Puerto Rico y de la ley. (Escolio omitido y énfasis suplido y en el original.)(38)
Señalamos lo siguiente sobre la doctrina de academici-dad:

Este caso contiene una situación verdaderamente preocu-pante respecto a la aplicación de los principios que compren-den la doctrina de la academicidad frente a violaciones graves, muy serias y recurrentes a la Constitución de Puerto Rico y ala ley por parte del Gobernador.

Tomamos conocimiento judicial que el Gobernador informó desde el principio del cuatrienio sobre la existencia de un dé-ficit presupuestario. También tomamos conocimiento judicial del hecho que desde principio del año fiscal 2005-2006 el Go-bernador anunció que los gastos presupuestados habrían de exceder los estimados de ingresos que han de recaudarse.
El Gobernador optó, al principio del año natural 2006, por reducir unilateralmente mediante una orden ejecutiva los fon-dos asignados por estatuto a la Rama Legislativa. Tal acción produjo la presentación de dos pleitos por los Presidentes de los cuerpos legislativos ante el Tribunal de Primera Instancia. Dichos asuntos fueron traídos ante nos mediante unos recur-sos de certificación. El Gobernador solicitó que se archivaran por académicos esos asuntos, porque había depuesto su actitud de reducirle a la Rama Legislativa su presupuesto, por haber sido identificadas unas fuentes de ingresos que excedían los estimados de ingresos formulados previamente y que hacían innecesaria su intervención con el presupuesto de esa rama de gobierno. Hace escasamente unos meses este Tribunal tuvo la oportunidad de dirimir esa controversia y de pautar norma al respecto y una mayoría decidió no hacerlo por estimar que el asunto se convirtió en académico. Disentimos de tal curso de acción sin opinión escrita, en aquel momento, porque enten-díamos que el Gobernador, con su proceder, estaba tratando de evadir la revisión de su actuación por este Tribunal. Nos refe-rimos al caso Presidente de la Cámara v. Gobernador, supra. La mayoría entendió que aquella controversia era académica porque no existía una probabilidad razonable de que volviera a repetirse y porque era muy especulativo concluir que una situación de crisis fiscal pudiera suscitarse en el futuro o que el Gobernador volviera nuevamente a reducir unilateralmente *402 los fondos disponibles de otra rama de gobierno para sufragar sus gastos, presupuestados por disposición legislativa. No fue así.
Posteriormente el Gobernador redujo no sólo los fondos asig-nados al Contralor, sino los de la Rama Judicial y, nueva-mente, los de la Rama Legislativa. Nos preguntamos, ¿cuándo era inminente que se le agotarían los fondos públicos disponi-bles para la Rama Ejecutiva? Lo cierto es que la insuficiencia de fondos de esa rama de gobierno apunta a mayo y junio de 2006, ebfinal del año fiscal 2005-2006. ¿Desde cuándo se cono-cía tal eventualidad? ¿Qué medidas y ajustes realizó el Gober-nador para reducir o eliminar tal escenario?
No tenemos duda alguna de que la actuación del Goberna-dor, de hace escasamente irnos meses, de deponer su actitud de intervenir los fondos de la Rama Legislativa, tuvo el propó-sito directo de tomar en académica aquella controversia que estaba ante nos. Por eso disentimos.
Este Tribunal no debió dejar en manos del Gobernador la potestad de decidir cuándo este Foro habría de revisar un planteamiento tan serio sobre actuaciones de su parte de vio-lación a principios y derechos constitucionales y estatutarios. Tenemos ante nos un caso que fue traído con la premura y la urgencia que requiere la situación. El Gobernador ha recu-rrido en su conducta, por lo que no existe garantía alguna de que en el futuro no habrá de incurrir nuevamente en acciones similares. No ha demostrado la inexistencia de una probabili-dad razonable de que vuelva a repetirse. Por el contrario existe, ante el cuadro político de un gobierno compartido, la probabilidad razonable de que una situación igual o similar vuelva a producirse. Persisten en este caso importantes conse-cuencias no colaterales sino directas, principalmente relacio-nadas con el funcionamiento del sistema de gobierno democrá-tico del país, que le garantiza al Pueblo la Constitución de Puerto Rico.
La mayoría permite con su inacción que el Gobernador vuelva a eludir nuestra revisión judicial e incurrir en el futuro en conducta igual o similar. Concluimos que este caso no es académico ni inmeritorio y que el país está pendiente del cabal cumplimiento de nuestro ministerio. Hoy este Tribunal clau-dica su función de preservar, proteger y garantizar al Pueblo de Puerto Rico el funcionamiento efectivo y eficiente de su sis-tema de gobierno democrático. (Enfasis suplido.)(39)
Añadimos, entonces, lo siguiente:
*403 El Gobernador no ha colocado a este Tribunal en posición de determinar que, de concederse el remedio solicitado, interven-dríamos en forma impermisible con su rol constitucional. Lo que está planteado en la controversia ante nos es si el Gober-nador excedió las facultades que le otorga la Constitución de Puerto Rico, en un escenario como el presentado. ¿Tenía el Go-bernador autoridad concedida por la Constitución de Puerto Rico o por la Legislatura para promulgar la OE-2006-10? ¿Te-nía el Gobernador, como deber ministerial impuesto por la Constitución de Puerto Rico, la obligación de cumplir y hacer cumplir la ley, que reconoce y establece la autonomía adminis-trativa, funcional y fiscal de la Oficina del Contralor'? ¿Violó el Gobernador el principio de forma republicana de gobierno de la Constitución de Puerto Rico al promulgar la OE-2006-10? Definitivamente todos estos asuntos están sujetos a revisión judicial. (Enfasis en el original.)(40)
Ninguna de esas interrogantes que señalamos fue con-testada por este Tribunal en aquel momento. ¿Cómo afectó tal inacción y consecuente claudicación del ministerio de este Tribunal, en ambos casos, el desarrollo y crecimiento de la grave crisis fiscal y económica que atravesó en el pasado y atraviesa actualmente la Rama Ejecutiva? ¿Cómo afectaron las medidas y las actuaciones incurridas y adop-tadas por los poderes políticos para lidiar con la situación económica del País frente a la ausencia de una delimita-ción de sus poderes y limitaciones por este Tribunal, de acuerdo con la Constitución del Estado Libre Asociado de Puerto Rico? Para analizar y tratar de buscar una contes-tación a esas interrogantes no habremos de pasar juicio sobre lo actuado por los poderes políticos en el pasado y en el presente en su función de formular la política pública para lidiar con tal problema, sólo en aquella medida en que no contravengan con la Constitución del Estado Libre Aso-ciado de Puerto Rico y la de Estados Unidos, en alguna de sus partes. Tal asunto le corresponde resolverlo al Pueblo de Puerto Rico en las elecciones generales y no a este Tribunal. Sí habremos de evaluar y analizar la conducta de *404 los poderes políticos que pudiera infringir los derechos y disposiciones contenidos en los referidos magnos documen-tos que cobijan y protegen a los puertorriqueños, y la inac-ción o actuación de este Tribunal en las diferentes contro-versias que llegaron ante sí que están directa o indirecta-mente relacionadas con la presente controversia y que pu-dieran afectar de una forma u otra su resolución.
La mayoría declinó, nuevamente, su jurisdicción sobre el mismo asunto, la necesidad de la delimitación de los con-tornos de la Constitución del Estado Libre Asociado de Puerto Rico en cuanto a los poderes del Gobernador para conjurar los graves problemas de la Rama Ejecutiva. Esto, a pesar de que las actuaciones del entonces Gobernador afectaban, directamente, el funcionamiento y operación de la Oficina del Contralor que, dentro de nuestro esquema constitucional democrático, es el organismo autónomo que fiscaliza el uso de los fondos públicos de las tres ramas de gobierno, en conformidad con la política pública de éstas, para ofrecer al Pueblo de Puerto Rico los servicios públicos que resultan indispensables y necesarios en áreas sensiti-vas de la vida de cientos de miles de puertorriqueños.
III
El 15 de noviembre de 2005 la Cámara de Representan-tes de Puerto Rico presentó el Proyecto de la Cámara 2193, con el objetivo de establecer la Ley de la Justicia Contribu-tiva de 2006. Dicho proyecto pretendía, según su texto ini-cial, establecer un impuesto sobre ventas, uso y almacenamiento. Fue aprobado por la Cámara de Repre-sentantes, referido al Senado y, posteriormente, aprobado por este último.(41)
Concluida la votación en ambos cuerpos, surgieron dife-rencias respecto a la tasa contributiva que, en efecto, se *405 impuso mediante la referida pieza legislativa. El Goberna-dor, Hon. Acevedo Vilá, y el Presidente del Senado, Hon. Kenneth McClintock, entendieron que el referido proyecto de ley imponía una tasa contributiva de un siete por ciento. Una mayoría de los miembros de la Cámara Baja expresa-ron que se impuso una tasa contributiva única y total de cinco y medio por ciento, distribuido en un cuatro por ciento correspondiente al impuesto estatal y en uno y me-dio por ciento correspondiente al impuesto municipal. Hi-cieron referencia a una serie de circunstancias y eventos que estaban dentro del expediente legislativo y otras que no estaban consignadas en éste pero que sí habían sido parte del proceso legislativo.(42)
El 4 de julio de 2006 el Gobernador, Hon. Acevedo Vilá, firmó el referido proyecto de ley. Desde entonces la Rama Ejecutiva comenzó a tomar todas las medidas necesarias para la imposición del impuesto estatal sobre la venta y el uso a una tasa contributiva de cinco y medio por ciento, a la cual a partir del 15 de noviembre de 2006 se le sumaría una tasa contributiva de uno y medio por ciento correspon-diente al impuesto municipal.(43)
Ante la inminente imposición de un impuesto a la venta con una tasa contributiva de siete por ciento, el Lie. Carlos Romero Barceló y el Sr. Peter Muller Maldonado, en cali-dad de contribuyentes afectados, y otras personas, en cali-dad de contribuyentes y pensionados afectados, presenta-ron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una demanda de sentencia declaratoria contra el Estado, el Gobernador, Hon. Acevedo Vilá, y el Secre-tario de Hacienda, Hon. Juan Carlos Méndez Torres. Im-pugnaron la interpretación de la Rama Ejecutiva a dicha pieza legislativa a los efectos de imponer una tasa contri-butiva de cinco y medio por ciento para el Estado y uno *406 y medio por ciento para los municipios, para un impuesto total máximo sobre ventas y uso de un siete por ciento.(44)
Una vez presentada la demanda de autos, expedidos y diligenciados los emplazamientos correspondientes, el 31 de octubre de 2006 los demandantes acudieron ante nos mediante un recurso de certificación. Adujeron que la in-tervención de este Foro era necesaria dado el interés pú-blico que revestía la referida controversia(45)
Concedimos a las partes, acortando los términos regla-mentarios, hasta el 7 de noviembre de 2006, para que se expresaran. Posteriormente concedimos el mismo término a ambos cuerpos legislativos para que hicieran lo propio. Concluimos en aquella ocasión que “[e\n vista de que la controversia planteada en el presente recurso —sobre cuál es la tasa contributiva que en realidad impone la Ley Núm. 117 de 4 de julio de 2006— es de alto interés público, que debe ser resuelta en forma definitiva y sin dilación alguna, ya que su fecha de vigencia es inminente, que dicha contro-versia no sólo afecta, de manera directa, el presupuesto del consumidor puertorriqueño sino que puede afectar el cré-dito del Estado Libre Asociado de Puerto Rico y, por ende, el futuro y el bienestar de todos los puertorriqueños, avala-mos la solicitud de certificación que ante este Tribunal pre-sentaron los demandantes y peticionarios”. (Enfasis suplido y en el original. )(46)
El 6 de noviembre de 2006 compareció ante este Tribunal, en calidad de amicus curiae, el Banco Gubernamental de Fomento (B.G.F.).(47) Entre otras cosas, dicho ente reco-noció la existencia de una crisis fiscal al expresar lo si-guiente: “el BGF acude a este Tribunal como parte de su *407 gestión de atender y resolver la crisis fiscal del Gobierno de Puerto Rico.” (Enfasis suplido.)(48)
En su escrito, el B.G.F. señaló que por treinta años los bonos de Puerto Rico gozaron de una clasificación de “A” por parte de las agencias clasificadoras de crédito “Standard & Poor’s Rating Services” (S & P), y de “Moody’s Investors Service, Inc.” (Moody’s). Sin embargo, el B.G.F. des-tacó que en mayo de 2005 S & P degradó el crédito de “A” a “BBB” que es la clasificación más baja que tiene cualquier jurisdicción de Estados Unidos y que está a un paso de caer en la categoría de bonos chatarra. “[A]ún degradado el cré-dito, S & P se reafirmó en una perspectiva negativa alu-diendo a posibles degradaciones futuras si continúa nues-tra precaria situación financiera ...”.(49)
El B.G.F. señaló que el 19 de mayo de 2005 Moody’s también degradó el crédito de “Baal” a “Baa2” y mantuvo una perspectiva negativa. Así, el 2 de mayo de 2006, colocó el crédito de Puerto Rico en alerta debido al cierre parcial del Gobierno.
Posteriormente, el 8 de mayo de 2006, Moody’s volvió a bajar la clasificación de todos los bonos de Puerto Rico, “lo que resultó en una degradación de todos los bonos en cir-culación de la Corporación para el Financiamiento Público a ‘Bal’, clasificación de nivel chatarra”.(50)
No obstante, según el B.G.F., la implantación del TVU del siete por ciento logró que Moody’s reclasificara el crédito de chatarra a uno de alerta “Baa3”. Sin embargo, el reco-nocimiento del B.G.F. sobre la crisis fiscal no dejaba de ser palmario. Muestra de ello fueron sus expresiones siguien-tes: “[e\n vista de la seria situación fiscal del Gobierno de Puerto Rico y de nuestra vulnerable situación crediticia ... mantener un IVU de siete (7) por ciento es esencial para ... *408 evitar degradaciones mayores al nivel de chatarra con las consecuencias nefastas que ello implicaría para Puerto Rico”.(51)
Por su parte, la parte recurrida, el Gobernador, Hon. Aníbal Acevedo Vilá, argüyó que del TVU, bajo una tasa de siete por ciento, “depende evitar la prolongación del déficit presupuestario estructural y la degradación del crédito del país”. (Énfasis suplido.) En otras palabras, el ex Mandata-rio reconoció, nuevamente, la existencia de una crisis fiscal pero ahora durante el curso del año fiscal 2006-2007.
Concluyó este Tribunal que “del texto de la ley —el cual' resulta ser la máxima expresión de la intención legislati-va— surge claramente que se estableció una tasa contribu-tiva máxima total de 7%, 5.5% correspondiente al impuesto estatal y un 1.5% correspondiente al impuesto municipal”. (52)
En aquella ocasión, el Juez Asociado Señor Fuster Ber-lingeri emitió una opinión de conformidad. El suscribiente y la Juez Asociada Señora Rodríguez Rodríguez emitieron opiniones disidentes por separado.
Sobre tal controversia expresamos, en aquella ocasión, que la decisión de la mayoría desvirtuaba la intención le-gislativa de la Cámara de Representantes que surge de nuestro expediente que, a su vez, es el cuerpo obligado por el Art. 3, Sec. 17 de la Constitución del Estado Libre Aso-ciado de Puerto Rico, supra, a originar medidas de recaudo. La mayoría ignoró el historial legislativo que existe en torno a la Ley Núm. 117, ya que el Senado aprobó dicha legislación sin debates, enmiendas o informes de Comisión, o sea, tal como quedó aprobada por la Cámara de Representantes. Le imprimió un peso desproporcionado al texto de la ley que hace referencia a un IVU total de siete por ciento cuando del expediente legislativo surge que tal *409 porcentaje es un error de redacción. No avalamos tal curso de acción. (53)
El profundo respeto que nos merece la intención del le-gislador nos obliga, en determinadas ocasiones, a suplir las inadvertencias en que éste pueda haber incurrido. Para evitar un resultado irrazonable e insostenible, en el pasado no hemos vacilado en aclarar el texto de una ley para con-formarlo a la intención legislativa. Es regla dorada de her-menéutica judicial, que las disposiciones de una ley deben ser examinadas e interpretadas de modo que no conduzcan a resultados irrazonables e insostenibles, sino armoni-osos.(54)
Sobre tal controversia, en aquella ocasión, en su opinión disidente, la Juez Asociada Señora Rodríguez Rodríguez expresó lo siguiente:
Este caso no es justiciable. Hoy, una mayoría de los miem-bros de este Tribunal sostiene que los demandantes, como con-tribuyentes y ciudadanos, tienen legitimación activa para im-pugnar en los tribunales la interpretación que hace la Rama Ejecutiva de una ley de contribuciones de aplicación general y uniforme aprobada por la Asamblea Legislativa, sin que éstos hayan alegado que haya habido violación constitucional de clase alguna. Disiento porque soy del criterio que la conclusión del Tribunal respecto la legitimación de los demandantes es errónea y no encuentra apoyo en la doctrina sobre el pleito del contribuyente.
Sostengo que ante la naturaleza generalizada de la queja presentada por los demandantes, sumado a la ausencia de un planteamiento de violación de un derecho constitucional por la puesta en vigor de la Ley de Justicia Contributiva de 2006, éstos carecen de legitimación activa como contribuyentes y pensionados, o ciudadanos, para impugnar la interpretación de la ley por parte de la Rama Ejecutiva. Ello a su vez nos lleva a concluir que el curso de acción correcto es la desesti-mación de la demanda instada.(55)
*410 El 4 de julio de 2006 el Gobernador firmó el referido proyecto de ley sobre ventas al detal. Surge de la referida controversia ante el Tribunal de Primera Instancia que después de esa fecha el Gobernador, Hon. Acevedo Vilá, aún persistía en su argumento de la necesidad de mayores recaudos para enfrentar la crisis fiscal de la Rama Ejecu-tiva cuando intentó imponer, y pretendió que este Tribunal le permitiera imponer, una tasa contributiva estatal de un cinco y medio por ciento en vez de un cuatro por ciento como pretendió la Cámara de Representantes. La resolu-ción de este Tribunal se produjo el 10 de noviembre de 2006. Nótese que ya la crisis fiscal de la Rama Ejecutiva estaba extendida al año fiscal 2006-2007.
IV
De las referidas tres controversias que atendió este Tribunal surge, claramente, la existencia de una recurrente crisis fiscal de la Rama Ejecutiva durante el cuatrienio que comenzó en enero de 2005 y culminó en diciembre de 2008. De los expedientes ante nos, surge la aprobación durante ese cuatrienio de diversas medidas legislativas a petición de la Rama Ejecutiva para resolver la grave crisis presu-puestaria de esa rama de gobierno. Surgen, además, deter-minaciones, como hecho incontrovertido, de los dos jueces del Tribunal de Primera Instancia mencionados previa-mente, a base de la prueba documental ofrecida de acuerdo con la entonces vigente Regla 36 de Procedimiento Civil, 32 L.P.R.A. Ap. III, de la existencia de una crisis fiscal en la Rama Ejecutiva.
En Díaz Saldaña v. Acevedo Vilá, supra, resuelto el 30 de junio de 2006, este Tribunal concluyó que atendidas las piezas legislativas aprobadas durante el mes de mayo de 2006, después de iniciado ese caso, “para conjurar los pro-blemas fiscales que atraviesa el Gobierno del Estado Libre *411 Asociado de Puerto Rico” declinó su jurisdicción.(56) No obs-tante, el Gobernador, Hon. Acevedo Vilá, con posterioridad al 4 de julio de 2006, persistió en su argumento ante nos de la necesidad de fondos adicionales para la Rama Ejecutiva (cinco y medio por ciento de impuesto de consumo estatal en vez del cuatro por ciento) durante el año fiscal 2006-2007. Este Tribunal asumió jurisdicción sobre la controver-sia, sin haberse desfilado un ápice de prueba ante el Tribunal de Primera Instancia, expidió el auto de certificación solicitado, concedió la petición de más fondos del Goberna-dor para la Rama Ejecutiva, reconociendo la grave crisis fiscal en que se encontraba esa rama de gobierno. No obs-tante, no le permitió a la Cámara de Representantes pre-sentar evidencia sobre sus alegaciones, que no constató su naturaleza y si podía ser de naturaleza testifical o documental. Este Tribunal actuó, en ese caso, sin el expe-diente completo que aquí exponen los compañeros disiden-tes como imprescindible por imperativo del debido proceso de ley y la norma jurisprudencial vigente sobre el tema. En ese caso, la mayoría de entonces apoyó el texto de la ley y su exposición de motivos para acoger la posición del Goberna-dor de que se le permitiera imponer un impuesto estatal sobre las ventas al detal de un cinco y medio por ciento y no el cuatro por ciento como reclamaba la Cámara de Representantes. No necesitó un expediente construido por el Tribunal de Primera Instancia con determinaciones de he-chos para ello. Al amparo de las premisas en contrario, esbozadas al presente por los distinguidos miembros de este Foro que disienten en este caso, como es su legítimo derecho, concluimos que son INCONSECUENTES con lo actuado por ellos mismos en Presidente de la Cámara v. Gobernador, supra, Díaz Saldaña v. Acevedo Vilá, supra, y Romero Barceló v. E.L.A., supra. No obstante, somos inca-paces, por las razones y motivos antes expuestos, de refe- *412 rirnos a nuestros compañeros, como lo hicieron las Juezas Asociadas Señoras Fiol Matta y Rodríguez Rodríguez en sus opiniones disidentes sobre los miembros de la mayoría en el presente caso, como veremos más adelante.
V

Opiniones disidentes

A. La distinguida Jueza Asociada Señora Fiol Matta expresa en su opinión disidente lo siguiente: “la opinión se equivoca al elaborar las premisas mayores de su razona-miento; es decir, las normas de derecho aplicables, según abundaremos más adelante, pero más peligrosamente. Se equivoca en cuanto a la función judicial se refiere, pues carece de una premisa menor válida, por cuanto descansa en los hechos expuestos en la Exposición de Motivos de la ley que son, en fin, los hechos alegados por el Estado. La unión de ambos errores de método tan sólo pueden llevar-nos al error en la decisión.” (Énfasis en el original supri-mido y énfasis suplido.)(57) Añade que la opinión mayorita-ria “acepta, sin prueba, que existe una crisis fiscal y un problema de gigantismo gubernamental, así como que no existe otra opción para corregir el déficit estructural del gobierno central, que no sea el despido de empleados pú-blicos y la suspensión de los derechos laborales. Esto, a pesar de que existen diversos informes o documentos que cuestionan estas hipótesis. En otras palabras, la mayoría de este Tribunal no tomó en consideración posiciones dis-tintas a la adoptada por la Legislatura, porque no hubo oportunidad para recibir y dirimir prueba en un Foro de Primera Instancia o administrativo”. (Énfasis en el original.)(58)
La Jueza Asociada Señora Fiol Matta puntualiza, sobre *413 este tema, que “la mayoría resume y parafrasea las partes de la Exposición de Motivos de la Ley Núm. 7, que aluden a la crisis fiscal. Específicamente, desglosa los datos sobre el alegado déficit estructural en cuatro subtemas, a saber: las razones para la crisis, las consecuencias de la crisis, las alternativas ante la crisis y la solución implantada por la Asamblea Legislativa. Finalmente, aplica dichos datos, cuya única fuente es la Exposición de Motivos, y que resul-tan ser también las alegaciones del Estado, sin examinar prueba que las sustente o las contradiga”. (Énfasis suplido y en el original.)(59)
Añade nuestra compañera, la distinguida Jueza Aso-ciada Señora Fiol Matta, “no pretendo negar la importan-cia que tiene este recurso y la bondad para el país de que se resuelva prioritariamente. Sin embargo, precisamente por ser un caso de alto interés público que incide de manera trascendental en los derechos laborales y constitucionales de los empleados afectados, era necesario evaluarlo con cui-dado y analizarlo desde diferentes perspectivas. Hacerlo no hubiera afectado en nada la situación existente, puesto que los empleados recurridos ya fueron despedidos de sus empleos. No obstante, como la mayoría de este Tribunal decidió certificar y consolidar estos casos para atender el asunto constitucional, a pesar de las consideraciones que hemos expuesto y de la ausencia de prueba en el legajo, nos vemos en la obligación de discutir los aspectos constitucio-nales de esta controversia”. (Énfasis suplido y escolio omitido. )(60)
La Jueza Asociada Señora Fiol Matta realiza el ejercicio de tratar de distinguir lo actuado por la entonces mayoría en noviembre de 2004 en Suárez v. C.E.E. I, 163 D.P.R. 347 (2004), y Suárez v. C.E.E. II, 163 D.P.R. 374 (2004), del pre-sente caso. Expresa que la controversia plantada en Suárez, supra, era solamente de derecho y no de hechos. Pun- *414 tualiza, en tal ejercicio, que el caso Suárez, supra, trata sobre el derecho fundamental al voto que le otorga nuestra Constitución a todos los puertorriqueños y por consiguiente era este Tribunal el llamado a entender inicialmente en esta controversia. Señala que en Suárez, supra, tuvimos el beneficio de una decisión que el Tribunal de Primera Ins-tancia había tomado en corte abierta.
La Jueza Asociada Señora Fiol Matta expresa que este Tribunal decidió abordar el asunto de la constitucionalidad del Cap. III de la Ley Núm. 7, consolidando casos disímiles y certificándolos prematuramente para apresurarse a resolver el asunto constitucional. Sostiene que tal actuación pro-voca que no hayamos cumplido con nuestra “función judicial constitucional de adjudicar controversias de forma mesurada y con justificación jurídica”. (Enfasis suplido.)(61)

Concluye que la génesis del problema fue la decisión de este Tribunal de certificar esos casos antes de que se reci-biera prueba o se desarrollaran las teorías de las partes a nivel de primera instancia. Sostiene que es necesario que se considere la complejidad de la controversia, su urgencia, la necesidad de recibir y dirimir la prueba y la etapa procesal en la cual se encuentra el caso.

Señala la Jueza Asociada Señora Fiol Matta que
[u]n análisis somero de los expedientes de los recursos con-solidados nos permite percibir que las controversias que se presentan no tan sólo son complejas, sino múltiples y diversas. Entre éstas, en algunos casos se alega discrimen por afiliación política, en otros discrimen por embarazo. También hay alega-ciones de discrimen por razón de edad; incumplimiento en la aplicación de la ley respecto a la antigüedad y al principio de mérito, así como alegaciones de exclusión de la aplicación de la ley, fundamentadas en el Artículo 37.02, entre otros. Además, se argumenta la inconstitucionalidad de la Ley Núm. 7 de 2009 por la violación del debido proceso de ley en su vertiente procesal y sustantiva, el menoscabo de las obligaciones con- *415 tractuales y la delegación inconstitucional de los poderes por parte de la Asamblea Legislativa al Poder Ejecutivo.(62)
Sostiene que, estos casos estaban asignados a distintos Jueces y no consta cuándo se tomó, ni quién tomó, la deci-sión de consolidarlos y asignarlos todos al Juez ponente, el compañero Juez Asociado Señor Kolthoff Caraballo. La consolidación de tan accidentada, por así decirlo, de estos casos es el segundo factor que provoca que el método y los fundamentos de derecho de la opinión mayoritaria resul-ten incompatibles e ilógicos.
Afirma que cada uno de estos asuntos pudo requerir la intervención del foro administrativo o del Tribunal de Pri-mera Instancia para dirimir prueba y crear un expediente que permitiera la labor efectiva de los foros apelativos, in-cluyendo este Tribunal. Puntualiza, como axiomático, que el derecho no se aplica en el vacío, sino que requiere de hechos que sirvan de base para aplicar las normas.(63)
Nos sorprenden las expresiones de la Jueza Asociada Señora Fiol Matta sobre el aspecto de la consolidación de los casos de epígrafe. De los expedientes internos que re-flejan la operación y el funcionamiento de nuestras oficinas constan los memorandos sobre tal asunto. A base de éstos se produjo la decisión sobre la consolidación emitida por este Tribunal de los casos de epígrafe. De tal procedi-miento, surge con claridad que la consolidación de estos casos no fue “accidentada
Más aún, constan de los expedientes en la oficina de cada juez los referidos memorandos que se circularon a tales efectos. Sabemos que todos los Jueces que compone-mos este Foro tenemos un gran cúmulo de trabajo, pero ello no puede ser razón para que no estemos relacionados con las incidencias particulares de cada caso, que a la vez producen los pronunciamientos judiciales que emitimos. *416 Todos los casos consolidados fueron asignados al miembro del Tribunal que se le había asignado el recurso más anti-guo, que fue el Juez Asociado Señor Kolthoff Caraballo, como es la norma en esos asuntos en el Tribunal General de Justicia en todos sus niveles.
Como es sabido, el mecanismo de consolidación surge de la Regla 38.1 de las Reglas de Procedimiento Civil, 32 L.P.R.A. Ap. III, que establece que:
Cuando estén pendientes ante el tribunal pleitos que en-vuelvan cuestiones comunes de hechos o de derecho, este po-drá ordenar la celebración de una sola vista o juicio de cual-quiera o de todas las cuestiones litigiosas envueltas en dichos pleitos; podrá ordenar que todos los pleitos sean consolidados; y podrá, a este respecto, dictar aquellas órdenes que tiendan a evitar gastos innecesarios o dilación.
Este mecanismo procesal de consolidación responde a la necesidad de darle concreción al principio axiomático sub-yacente en las Reglas de Procedimiento Civil, que predica la “solución justa, rápida y económica de todo procedimiento”. Véase Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Este postulado hace asequible que los tribunales unan dos o más pleitos ante su consideración para su tramitación o juicio. Hosp. San Fco., Inc. v. Sria. de Salud, 144 D.P.R. 586, 592 (1997). Véase, además, J.A. Cuevas Segarra, Tratado de Derecho Procesal Civil, San Juan, Pubs. J.T.S., 2000, T. II, pág. 630. La finalidad de este vehículo procesal es “evitar la proliferación de accio-nes, lograr la economía procesal y evitar la indeseable pro-babilidad de que surjan fallos incompatibles relacionados con un mismo incidente”. Vives Vázquez v. E.L.A., 142 D.P.R. 117, 125 (1996), citando a Granados v. Rodríguez Estrada II, 124 D.P.R. 593, 608 (1989).
De la faz de la Regla 38.1 de Procedimiento Civil, supra, surgen dos requisitos o criterios que se deben ponderar para que proceda la consolidación de los casos en cuestión. Primero, que los casos presenten cuestiones comunes de hechos o de derecho. Segundo, que los casos estén pendien- *417 tes ante el tribunal. Véase Vives Vázquez v. E.L.A., supra, pág. 126. Sobre este último requisito, hemos señalado que en nuestro sistema judicial unificado la frase “cuando es-tén pendientes ante el tribunal” sólo requiere que los casos a consolidarse se hayan presentado y su trámite este pen-diente ante alguna de las salas del Tribunal de Primera Instancia. Hosp. San Fco., Inc. v. Sria. de Salud, supra, págs. 591-592.
En torno al primer requisito, en Vives Vázquez v. E.L.A., supra, pág. 127, este Tribunal sostuvo que la consolidación de acciones o recursos puede permitirse sin que sea nece-sario que la totalidad de las cuestiones de hechos y de de-recho sean idénticas. Por tal, las consideraciones particu-lares que puedan caracterizar a algunos recursos no son óbice para que la consolidación sea concedida. Id. Véase, además, Skirvin v. Mesta, 141 F.2d 668 (10mo Cir. 1944). De igual manera, este Foro señaló que las cuestiones de hechos y de derecho no tienen que ser comunes en los casos a consolidarse; basta que exista afinidad entre unas y otras. Finalmente, tampoco se requiere que haya identidad entre las partes en los pleitos a consolidarse para conceder la consolidación. Hosp. San Fco., Inc. v. Sria. de Salud, supra, pág. 593; Vives Vázquez v. E.L.A., supra. Véase, además, R. Hernández Colón, Práctica jurídica de Puerto Rico: derecho procesal civil, 4ta ed., San Juan, Pub. LexisNexis, 2007, See. 3601, pág. 303.
Es importante destacar que la consolidación de pleitos puede ser ordenada a solicitud de una parte o motu proprio por el tribunal. Díaz Maldonado v. Lacot, 123 D.P.R. 261, 266 esc. 2 (1989); R. Hernández Colón, op. cit., See. 3601, pág. 303. Además la consolidación puede proceder a nivel apelativo. Véase Otero v. Delbrey, 144 D.P.R. 688 (1998).
Por otro lado, no es extraña a este Foro la práctica de consolidar para efectos de su adjudicación distintos recur-sos en la propia opinión emitida. Véanse: In re Colón Rivera, 170 D.P.R. 440, 442 (2007); Pérez v. VPH Motor Corp., *418 152 D.P.R. 475, 482 (2000); Montoto v. Lorie, 145 D.P.R. 30, 37 esc. 2 (1998); Aponte v. Sears Roebuck de P.R., Inc., 144 D.P.R. 830, 838 (1998); Vives Vázquez v. E.L.A., supra, pág. 122 esc. 4; Bacardi Corp. v. Congreso Uniones Inds., 141 D.P.R. 100, 102 (1996); P.P.D. v. Gobernador I, 139 D.P.R. 643, 650-651 (1995); Pilot Life Ins. Co. v. Crespo Martínez, 136 D.P.R. 624, 631 (1994); Díaz Maldonado v. Lacot, supra. De hecho, tal proceder es refrendado por la Regla 50 de este Tribunal que dispone lo siguiente: “[e]n situaciones no previstas por este reglamento, el tribunal encauzará el trámite en la forma que a su juicio sirva los mejores inte-reses de todas las partes”. Regla 50 del Tribunal Supremo de Puerto Rico, 4 L.P.R.A. Ap. XXI-A. Véase, además, Pérez v. VPH Motor Corp., supra.
De acuerdo con la preterida normativa, es indubitado que los hechos esbozados, en la opinión mayoritaria de-muestran fehacientemente que este Tribunal se enfrentó a varios casos motivados por una misma actuación, el des-pido de distintos empleados públicos al amparo de la Ley Núm. 7. Si bien es cierto que las partes, los puestos que ocupaban y sus lugares de trabajo eran distintos, no es menos cierto que todos impugnaban la constitucionalidad de la Ley Núm. 7. Es decir, la controversia esencial en cada uno de los casos consolidados era la misma. Por tal razón, aunque cada recurso tenía ciertas consideraciones particu-lares que le caracterizaban, eso no era un impedimento para que concediéramos la consolidación para considerar el referido planteamiento, común de todos ellos.
En fin, por estar pendiente ante nuestra consideración y por ser las cuestiones de hechos y de derecho comunes en los recursos, procedía su consolidación. Además, como he-mos esbozado, no existe ningún impedimento para que lo hiciéramos al momento de emitir la opinión, luego de ha-ber recibido el aval de la mayoría de los miembros de este Tribunal, según surge del procedimiento colegiado mencio-nado previamente.
*419 B. Por otra parte, la distinguida Jueza Asociada Se-ñora Fiol Matta señala que la opinión mayoritaria es me-todológicamente incorrecta porque recurre a la interpreta-ción que han hecho los tribunales apelativos federales sobre la norma establecida por el Tribunal Supremo federal en United States Trust Co. v. New Jersey, 431 U.S. 1 (1977).(64) Nada más lejos de la verdad.
Como principio básico de metodología jurídica procede recurrir, a modo ilustrativo, a las interpretaciones que han realizado los tribunales apelativos federales sobre las nor-mas establecidas por el Tribunal Supremo de Estados Uni-dos, de forma que se le pueda dar contenido a lo dicho por ese máximo foro. De hecho, esta “metodología” ha sido uti-lizada por la Jueza Asociada Señora Fiol Matta que al pre-sente le adscribe el carácter de impropiedad o ilegitimidad. Véase Pueblo v. Velázquez Colón, 174 D.P.R. 302 (2008).
Como bien explicamos en la opinión mayoritaria, el Tribunal Supremo de Estados Unidos ha expresado que en casos de contratación pública no es correcto dar deferencia absoluta al análisis de razonabilidad y necesidad que hizo el Estado. No obstante, el propio Tribunal Supremo federal reconoce y postula como necesario conceder alguna defe-rencia a la actuación estatal.
Según citamos en la opinión mayoritaria y ahora nos vemos precisados a repetir, así lo han interpretado los tribunales federales apelativos al darle contenido a lo dicho por el Tribunal Supremo federal. En Local Div. 589, etc. v. Comm. of Mass., 666 F.2d 618, 643 (1981), cert. denegado, Local Division 589, Amalgamated Transit Union, AFL-CIO, CLC v. Commonwealth of Massachusetts, 457 U.S. 1117 (1982)), el Tribunal Federal de Apelaciones para el Primer Circuito señaló lo siguiente:
[D]etermining the “reasonableness and necessity’ of a particular statute is a task far better suited to legislators than to *420 judges. Thus, in the case before us, where economic or social legislation is at issue, some deference to the legislature’s judgment is surely called for. (Enfasis suplido.)
De igual modo se manifestó el Tribunal Federal de Ape-laciones para el Segundo Circuito, en Buffalo Teachers Federation v. Tobe, 464 F.3d 362, 370 (2do Cir. 2006) (certio-rari denegado en Buffalo Teachers Federation v. Tobe, 550 U.S. 918 (2007)), al enunciar lo siguiente:
We hasten to point out that less deference does not imply no deference .... Relatedly, we agree with the First Circuit that U.S. Trust Co. does not require courts to reexamine all of the factors underlying the legislation at issue to make a de novo determination whether another alternative would have constituted a better statutory solution to a given problem. (Enfasis suplido.)
Añade la Jueza Asociada Señora Fiol Matta que “para determinar los hechos relevantes, la opinión mayoritaria se sustenta exclusivamente en la Exposición de Motivos y acepta, sin prueba, que existe una crisis fiscal y un pro-blema de gigantismo gubernamental, así como que no existe otra opción para corregir el déficit estructural del gobierno central, que no sea el despido de empleados públi-cos y la suspensión de los derechos laborales”. (Enfasis suplido.)(65)
Por el contrario, la Legislatura sí contempló y dispuso sobre otras medidas para resolver la crisis fiscal de la Rama Ejecutiva en la Ley Núm. 7. Incluyó, en un plan integral para ello, medidas de ingresos y mejor fiscaliza-ción, medidas de reducción de gastos y otras financieras, entre muchas otras. Sobre esos extremos, el proceso que fue descargado por los poderes políticos en la formulación de política pública sobre “la declaración de un estado de emergencia fiscal y el establecer el plan integral de estabi-lización fiscal para salvar el crédito de Puerto Rico” es una *421 cuestión política con la cual no habremos de intervenir pues no es nuestra función transformarnos en un SUPER GOBIERNO sobreponiéndonos sobre las otras dos ramas políticas del Estado y gobernar sobre áreas propias de esos poderes políticos, a través del procedimiento de sentencia declaratoria e injunction. Nuestra función es auscultar, como así lo hicimos extensamente, si está presente en dicho proceso político alguna violación a los derechos protegidos de los demandantes de autos otorgándole el grado de defe-rencia al proceso legislativo que el ordenamiento jurídico exige. Sobre este asunto existe un abismo entre el criterio de la mayoría y de los disidentes en el presente caso, que como hemos podido observar es INCONSECUENTE con la postura de estos últimos en el pasado en los casos mencio-nados previamente y que están relacionados con la pre-sente controversia. Los Jueces disidentes no le otorgan de-ferencia alguna al proceso de las dos ramas políticas del gobierno, por ausencia de prueba, en el caso ante nos. No obstante, en forma INCONSECUENTE con lo actuado por ellos en los casos previamente relacionados, en que impar-tieron una deferencia desproporcionada al referido proceso político de gobierno, sin exigir un ápice de prueba, como es su criterio al presente.
La Jueza Asociada Señora Fiol Matta expresa, citando a Warner Lambert Co. v. Tribunal Superior, 101 D.P.R. 378, 398 (1973), que las declaraciones legislativas sobre los males sociales que el legislador intenta remediar merecen el respeto de este Tribunal. No obstante, sentencia que tales declaraciones deben estar fundadas en hechos de conoci-miento general y no constituir un mero fíat legislativo.(66) La presente crisis fiscal de la Rama Ejecutiva es de amplio conocimiento público y judicial, como hemos podido apreciar. No compartimos la óptica de la distinguida Jueza disidente en su ejercicio de aplicación de dicha normativa jurisprudencial al presente caso. No consideramos lo ac- *422 tuado durante el proceso legislativo, frente a la grave crisis fiscal que atraviesa la Rama Ejecutiva, como un mero fíat legislativo.
Además, la Jueza Asociada Señora Fiol Matta sostiene que por no haberse construido un expediente en el Tribunal de Primera Instancia y no contar con determinaciones de hechos de ese foro primario, la mayoría estaba impedida de decretar la inconstitucionalidad de la Ley Núm. 7. No obstante, la distinguida Juez disidente concluye que dicho estatuto es inconstitucional, aunque no se presentara prueba para rebatir la presunción de validez constitucional que le cobija a toda ley aprobada. Si ella entiende que es necesaria la presentación de prueba ante el Tribunal de Primera Instancia para evaluar la constitucionalidad de la ley, ¿cómo puede proceder en contrario, sin contar con esa prueba, para concluir que es inconstitucional? No entende-mos tal razonamiento. No hay la necesidad en el presente asunto de desfilar prueba alguna ante el Tribunal de Pri-mera Instancia para evaluar la constitucionalidad de la Ley Núm. 7, y así procedimos. Puntualizamos que la Jueza Asociada Señora Fiol Matta procedió a evaluar la validez del referido asunto de igual forma.
La Jueza Asociada Señora Fiol Matta luego de pronun-ciar que la mayoría se “apresuró” a adjudicar la controver-sia ante nos “sin mesura y justificación jurídica”, debido a la ausencia de prueba en los autos, refiriéndose a la deci-sión de declarar válido el referido estatuto, concluyó que el Cap. III de la Ley es inconstitucional no tan sólo de su faz sino en su aplicación. Según la distinguida Jueza Asociada Señora Fiol Matta, hay “mesura y justificación jurídica”, con el expediente ausente de prueba presentada ante el Tribunal de Primera Instancia, para concluir sobre la in-constitucionalidad del referido estatuto pero no tiene esa misma “mesura y justificación jurídica” la mayoría para concluir lo contrario, con el mismo escenario.
*423 La compañera Jueza Asociada Señora Fiol Matta se la-menta de que “[l]a Constitución es algo más que un depó-sito de palabras” (énfasis en el original)(67) describiendo el proceso de razonamiento jurídico y decisional de la mayo-ría y señala que “después de esta decisión, el derecho cons-titucional en las escuelas de Derecho se enseñará ‘antes’ y ‘después’ de la Ley Núm. [7 de 2009] ...”. (Enfasis supli-do.)(68) La Jueza Asociada Señora Rodríguez Rodríguez se expresa en forma similar al señalar que la opinión del Tribunal se revela como “galimatías constitucionales”, expues-tas así, sin un análisis jurídico riguroso que acompañe la extensa e innecesaria disertación, entre varios adjetivos que nos dirigiera. El diccionario de la Real Academia de la Lengua Española, vigésima primera edición, define la pa-labra “galimatías” como “escrito embrollado” que contiene “lenguaje oscuro por la impropiedad de la frase o por la confusión de las ideas”. Con mucho respeto, tenemos que rechazar vehementemente esas aseveraciones. En todo caso, si hay un cambio en el derecho constitucional que merece estudio es el que ocurrió en los casos que la compa-ñera Jueza Asociada Señora Fiol Matta cita en su opinión disidente: Suárez v. C.E.E. I, supra, y Suárez v. C.E.E. II, supra.
En aquel entonces, el Juez Presidente y las Señoras Juezas Asociadas que hoy disienten, como parte de la ma-yoría, ignoraron las directrices recogidas en el caso seminal de E.L.A. v. Aguayo, 80 D.P.R. 552 (1958), y su progenie. Este Tribunal asumió jurisdicción y emitió una opinión en un caso acogido mediante el recurso de certifi-cación, aunque: (1) la parte peticionaria no había sido ad-versamente afectada por la decisión revisada, pues había prevalecido en la agencia administrativa (la Comisión Es-tatal de Elecciones) y la validez de ese dictamen no se había *424 cuestionado, y (2) no había jurisdicción por la presencia de un “Notice of Removal” del caso al foro federal.
Ahora, cuando se resuelve una cuestión de derecho me-diante el mecanismo procesal de la certificación, dentro de un “caso y controversia justiciable”, y se recurre a normas de derecho ya establecidas en la jurisprudencia, la Jueza Asociada Señora Fiol Matta dice que hay un derecho cons-titucional distinto. Las preguntas obligadas son, ¿qué pasó en Suárez v. C.E.E. I, supra; y Suárez v. C.E.E. II, supra? ¿Cuándo fue que en realidad se deshicieron “los fundamen-tos metodológicos de la mejor hermenéutica constitucio-nal ... ?” ¿Es ahora que atendemos un asunto de derecho en el ejercicio de nuestra función como máximos intérpretes de la Constitución o fue entonces, en Suárez v. C.E.E. I, supra, y Suárez v. C.E.E. II, supra, cuando este Tribunal emitió una opinión consultiva en ausencia de un “caso y controversia justiciable?”
“Después” de Suárez v. C.E.E. I, supra, y Suárez v. C.E.E. II, supra, surgió un derecho constitucional diferente al de “antes”, al de E.L.A. v. Aguayo, supra, o cuando me-nos por “excepción”, en aquel momento y para aquel caso, sobre el aspecto de justiciabilidad. Por la situación del mo-mento, los límites constitucionales de “caso y controversia” pasaron a ser un mero “depósito de palabras”.
C. Por su parte, el distinguido Juez Presidente Señor Hernández Denton disiente del curso de acción de la ma-yoría porque afirma que el trámite judicial en este caso fue apresurado y resulta contrario al debido proceso de ley al eliminar los derechos adquiridos sobre los empleos de miles de servidores públicos en violación de la prohibición cons-titucional contra el menoscabo de obligaciones contractua-les, establecida tanto en la Constitución del Estado Libre Asociado de Puerto Rico como en la Constitución de Esta-dos Unidos. Sostiene que la opinión del Tribunal que de-clara válida la Ley Núm. 7 se basa en un expediente judi *425 cial desprovisto de la prueba necesaria para resolver de forma adecuada y fundamentada la controversia.(69)
Señala el Juez Presidente Señor Hernández Denton que la opinión del Tribunal ni siquiera cumple con el ámbito mínimo de protección establecido en la Constitución de Es-tados Unidos. Afirma que la opinión nos ha colocado al mar-gen de la normativa que formuló el Tribunal Supremo de Estados Unidos sobre la referida prohibición constitucional. Se refiere el distinguido compañero a la necesidad de un expediente judicial que contenga prueba que permita evaluar adecuadamente los criterios establecidos en U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1 (1971), y que adoptó este Tribunal en Bayrón Toro v. Serra, 119 D.P.R. 605 (1987). Puntualiza, como más imperiosa, la aplicación de tal nor-mativa a este caso al considerar la magnitud del impacto de la Ley Núm. 7 sobre los empleados públicos afectados y el efecto que la decisión del Tribunal tendrá en el País. (70) No obstante, no consideró como importante, ni siquiera en me-nor grado, la aplicación de estas doctrinas jurisprudenciales de acuerdo a su presente criterio, a los casos de Presidente de la Cámara v. Gobernador, supra; Díaz Saldaña v. Acevedo Vilá, supra; Romero Barceló v. E.L.A., supra; Suárez v. C.E.E. I, supra, y Suárez v. C.E.E. II, supra.
Igual que la Jueza Asociada Señora Fiol Matta, el Juez Presidente Señor Hernández Denton concluye que “la de-cisión que el Tribunal emite en el caso de autos se toma basada únicamente en el propio texto de la Ley Núm. 7, supra, y su Exposición de Motivos, sin que se haya presen-tado en los tribunales la prueba necesaria para establecer que el plan de cesantías decretado era la alternativa menos onerosa de acuerdo con la situación fiscal, según lo reque-rido por la doctrina establecida por el Tribunal Supremo de Estados Unidos, y sin permitir que los empleados cesan *426 teados la refutaran. Con la Opinión del Tribunal en este caso, nos colocamos al margen de la Constitución federal y correspondería entonces al Tribunal Supremo de Estados Unidos rectificar esta decisión”. (Enfasis suplido.)(71)
El Juez Presidente Señor Hernández Denton considera como contrario a las normas de derecho aplicables en Puerto Rico el que este Tribunal no vacilara en expedir los recursos de certificación de epígrafe a pesar de la naturaleza discre-cional y excepcional que caracteriza este tipo de recurso. Concluye que el Tribunal circunvaló el trámite ordinario en los casos de epígrafe por no contar con un expediente para dilucidar las alegaciones de las partes. Expresa que “cada uno de los recursos de epígrafe llegó ante la consideración de este Foro a pocos días de presentarse las demandas corres-pondientes ante el Tribunal de Primera Instancia y diligen-ciarse los emplazamientos”. (Enfasis suplido.) En esencia, afirma que los autos de los casos ante nuestra consideración solamente consisten en la petición de certificación, la de-manda y los alegatos de las partes. Puntualiza que la inter-vención de este Tribunal fue a destiempo porque no permitió al Tribunal de Primera Instancia celebrar una vista oral o evidenciaría. (72)
Contrario a lo expuesto por el Juez Presidente Señor Hernández Denton y la Jueza Asociada Señora Fiol Matta, auscultamos a la saciedad los datos y hechos constatados en la exposición de motivos que justifican las medidas que el Estado se ha visto obligado a tomar para conjurar una crisis fiscal que nos afecta a todos. Como bien expuso la opinión mayoritaria:
[L]a ley en cuestión presenta un cuadro fiscal de un Go-bierno que se encuentra al borde del caos. Esta conclusión no está basada en meras especulaciones sin fundamento, sino en fuentes autorizadas, como lo son: la Junta de Planificación, el B.G.F. y los Informes de Transición 2008, de Presupuestos del *427 Gobierno de Puerto Rico, de la OGP y del Departamento de Hacienda. Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 60 (2010).
Así, como medio probatorio, tomamos conocimiento judicial de esta crisis fiscal de la misma forma que lo hizo el Juez Presidente Señor Hernández Denton en su opinión disidente en Yiyi Motors, Inc. v. E.L.A., 177 D.P.R. 230 (2009). El Señor Juez Presidente, en su opinión disidente en el presente recurso, señala que “somos conscientes de la crisis fiscal que afecta las arcas del Estado y de los esfuer-zos que están realizando los poderes constitucionales para atender esta situación ...”. (Enfasis suplido.)(73) Así lo hizo este Tribunal en el pasado en los casos antes relacionados. Nos parece claro que es innecesario efectuar una vista evi-denciaría para establecer aquello de lo que ya "somos cons-cientes”, es decir, aquello que ya quedó probado mediante conocimiento judicial por este Tribunal en el pasado.
El legislador justificó en su extensa Exposición de Moti-vos, incluida en la Ley Núm. 7, la razonabilidad y necesi-dad de las medidas alternas que ha tomado la Rama Eje-cutiva para atender con carácter de urgencia la crisis que nos afecta. Eso no son meras alegaciones. Es la política pública establecida por ley. Sólo luego de ese análisis es que resolvimos, dándole a la determinación de necesidad y razonabilidad que hizo el legislador, el grado de deferencia que ella merece en un estado de emergencia fiscal declarado legislativamente, en un sistema republicano de gobierno. En nuestro sistema constitucional, no es permisible que un juez celebre un juicio de novo para revisar la necesidad y sabiduría de una ley fiscal.(74)
Por otra parte, es meritorio referirnos a las expresiones que hizo el Juez Presidente Señor Hernández Denton en su *428 opinión disidente respecto a la necesidad de celebrar una vista antes de hacer una determinación sobre la razonabili-dad y necesidad de la medida: "el Estado debe probar en los tribunales que la medida es razonable y necesaria.” (Enfasis en el original. )(75) No obstante, no le adscribió ese mismo rigor al Estado en los casos de Presidente de la Cámara v. Gobernador, supra, y en Díaz Saldaña v. Acevedo Vilá, supra. En este último, este Tribunal tomó conocimiento judicial de que las medidas legislativas aprobadas en mayo de 2006, para conjurar la crisis fiscal, eran “razonables y nece-sarias”, en ausencia de prueba alguna presentada por el Es-tado en ambos casos. Le impartió en aquel momento una absoluta, total y ciega deferencia al proceso realizado por las ramas políticas de gobierno. Muy respetuosamente identifi-camos una INCONSECUENCIA entre aquel proceder y el actual.
El Juez Presidente Señor Hernández Denton añade en su opinión disidente que United States Trust Co. v. New Jersey, supra, exige celebrar una vista evidenciaría. En ninguna parte de la opinión emitida por el máximo foro federal se menciona tal cosa. Lo único que la normativa de dicho caso exige es que el Estado demuestre la necesidad y razonabili-dad de la medida, dándole deferencia a la determinación del legislador por imperativo del principio y doctrina de la se-paración de poderes. Esto no quiere decir que la normativa federal obligue a la celebración de una vista evidenciaría como único mecanismo para que el Estado demuestre la ne-cesidad y razonabilidad de la medida. En el caso ante nos, el Estado demostró mediante los hechos y datos que surgen de la Exposición de Motivos de la Ley Núm. 7, que las medidas impugnadas eran razonables y necesarias. Se atendió de esa forma, como cuestión de derecho, el planteamiento sobre in-constitucionalidad del referido estatuto.
Con tal deferencia no estamos abdicando a nuestro rol constitucional. Todo lo contrario. No podemos, como pre- *429 tenden los disidentes, “abdicar a nuestra función judicial” de salvaguardar el mandato constitucional de separación de poderes para convertirnos en un SUPER GOBIERNO. Nuestra Constitución nos lo prohíbe.
D. La distinguida Juez Asociada Señora Rodríguez Ro-dríguez expresa en su opinión disidente que no puede ava-lar la Opinión del Tribunal porque, a su juicio, la decisión trastoca las vidas de miles de servidores públicos sin con-cederles a éstos su verdadero día en corte. Caracteriza la Opinión del Tribunal como “galimatías constitucionales, expuestas así, sin un análisis jurídico riguroso que acom-pañe la extensa e innecesaria disertación, y carente, ade-más, de evidencia que fundamente sus conclusiones”. (En-fasis suplido.)(76) Sostiene que la decisión de este Tribunal valida, “cual sello de goma”, los argumentos del Estado.(77) Sostiene que el trámite acelerado de certificación para resolver apresuradamente las controversias planteadas, hizo posible nuestra actuación “cual sello de goma”. (Énfasis suplido.) Puntualiza que el expediente de estos casos esta huérfano de prueba que sostenga las conclusiones respecto a la Ley Núm. 7. Caracteriza de fatalidad el proceso adju-dicativo llevado a cabo por este Tribunal porque los casos ante nos contienen, además de asuntos de derecho, contro-versias cuya resolución no es factible sin recibir pruebaj(78) La distinguida Juez Asociada expresa que las alegaciones realizadas por los demandantes de autos, relativa a discri-men por afiliación política, por razón de edad, menoscabo de obligaciones contractuales y violaciones al principio de mérito, antigüedad en el empleo, requerían, como mínimo, la presentación de prueba sobre las violaciones constitucio-nales señaladas.(79) Describe el proceso de expedir los re- *430 cursos de certificación seguido por la mayoría como uno gobernado por la “despreocupación de los miembros de la mayoría” al certificar estos casos en un trámite “fast track o por descargue”. Describe y señala el criterio judicial ma-yoritario al evaluar, analizar y disponer de los reclamos de los demandantes como que demuestra “liviandad”. Con-cluye que tal actuación vulnera los valores más elementa-les de debido proceso de ley y de mi procedimiento justo. (80)

A esos efectos, en la opinión mayoritaria este Tribunal concluyó que las alegaciones sobre menoscabo a las obliga-ciones contractuales derivadas de los respectivos empleos de los demandantes de autos, de violaciones a la igual pro-tección de las leyes, al principio del mérito y al debido pro-ceso de ley de los demandantes, no necesitan de la presen-tación de prueba ante el Tribunal de Primera Instancia para disponer de ellas. Surge del estatuto y del proceso le-gislativo, al cual le adscribimos deferencia, el criterio de razonabilidad que gobierna este asunto. No obstante, en cuanto a los demás planteamientos de los demandantes de autos, devolvimos el caso al Tribunal de Primera Instancia para que celebre una vista evidenciaría para que puedan presentar prueba y sostenerlas.

La Juez Asociada Señora Rodríguez Rodríguez, en su opinión disidente, se quejó de la falta de “un análisis jurí-dico riguroso” de la mayoría en la opinión del Tribunal y de todas las otras terribles imputaciones que relacionamos previamente. Terminó uniéndose a la campaña de descré-dito y demonización que denunció el Juez Asociado Señor Martínez Torres en la opinión de conformidad emitida en Yiyi Motors, Inc. v. E.L.A., supra.

Como indicamos en nuestro voto particular de 2 de fe-brero de 2010, la Opinión del Tribunal se circuló veinte y nueve días antes de la fecha de su certificación. Lo único que se emitió en “fast track” o a manera de descargue en 
*431
este recurso, es decir, sin permitir reacción o debate, fueron las opiniones disidentes, que se certificaron en violación de la Regla 5(b) de nuestro Reglamento, 4 L.RR.A. Ap. XXI-A.

(81)

Por otro lado, una imputación de parcialidad como la que la Juez Asociada Señora Rodríguez Rodríguez hizo a quienes discrepamos de ella, sería objeto de alguna medida disciplinaria si la hubiera lanzado un abogado. Véase In re Cardona Álvarez, 116 D.P.R. 895 (1986). La inmunidad de la que gozamos nos permite hacer manifestaciones como esas sin enfrentar sanciones, como miembros de este Tribunal, pero no nos exime de la postura tradicional de ecua-nimidad, de exhibir un temperamento judicial en nuestras actuaciones y ponencias escritas ni de la obligación moral de observar lo que exigimos a todos los abogados del país. Si abandonamos estos postulados perdemos la fuerza moral para exigir mesura a los abogados.
Por eso, este Tribunal, por voz del entonces Juez Aso-ciado Señor Hernández Denton, ha dicho en el pasado, ci-tando al jurista Roscoe Pound, lo siguiente:
Escribir una opinión disidente conlleva mía responsabili-dad. ... No hay cabida en las opiniones suscritas por jueces de un tribunal estatal de última instancia para la censura des-mesurada, para la extrema vituperación, acusaciones de mal-sanas motivaciones a la opinión mayoritaria e insinuaciones de incompetencia, negligencia, prejuicio o insensibilidad por parte de los otros jueces del tribunal. ... Para justificar una disidente denunciatoria, la cuestión de derecho debe ser de considerable importancia. Para justificar una disidente en que se censura a un colega, si esto es al fin justificable, la cuestión de derecho debe ser excepcionalmente decisiva y los errores señalados de la más seria naturaleza. ... [L]a opinión de un juez de última instancia debe expresar sus razones y no sus *432 opiniones particulares. R. Pound, Cacoethes Dissintiendi: The Heated Judicial Dissent, 39 A.B.A.J. 794, 795 (1953).(82)
La disidencia vigorosa tiene un rol de suma importancia en un foro colegiado como éste. Bien empleado, un disenso presenta visiones alternas de una controversia. En ocasio-nes, abre nuevos caminos en el campo del derecho. No obs-tante, quienes recurren al ataque personal para sostener una opinión “claramente denotan la falta de argumentos válidos para avalar la misma o una falta de conocimiento o dominio sobre la materia”. Granados v. Rodríguez Estrada II, 124 D.P.R. 593, 616 esc. 1 (1989), opinión concurrente y de conformidad de la Jueza Asociada Señora Naveira de Rodón.
E. En cuanto a la distinción entre un derecho adqui-rido y un interés propietario, bien se señala en la opinión mayoritaria que un empleado tiene un interés propietario sobre la retención de su empleo siempre y cuando esté pro-tegido por una ley o cuando las circunstancias crean una expectativa razonable de continuidad. Ahora bien, en lo re-ferente al argumento de los peticionarios en cuanto a que éstos poseen un derecho adquirido a la retención de sus empleos, la Opinión de este Tribunal precisa que ninguno de los estatutos previos, afectados por la Ley Núm. 7, que decreta un estado de emergencia fiscal, le conferían a los empleados públicos la posibilidad de permanecer en su em-pleo indefinidamente. Esto es, sin que exista la posibilidad de que sean cesanteados por falta de trabajo o de fondos que permitan remunerar su trabajo realizado. Más bien, todo lo contrario. Las leyes relacionadas al asunto en con-troversia contemplaban, aun antes de la aprobación de la Ley Núm. 7, la posibilidad de que el empleado público fuera cesanteado aun cuando ello no respondiera a accio- *433 nes disciplinarias entabladas en su contra, bajo las cir-cunstancias antes descritas.
A pesar de lo anterior, al Juez Presidente Señor Her-nández Denton y a la Juez Asociada Señora Rodríguez Ro-dríguez les resulta “incomprensible” la distinción que hace la mayoría del Tribunal al adjudicar el caso de epígrafe, en el cual no se le reconoce a los empleados cesanteados un derecho adquirido a retener sus empleos, vis-á-vis nuestra decisión de otorgar escoltas policiacas vitalicias a los ex gobernadores por éstos haber obtenido un derecho adqui-rido a esa protección. Sin embargo, ambos casos son clara-mente distinguibles.
En el caso de autos, los empleados cesanteados no tienen como parte de su patrimonio un derecho adquirido como consecuencia de un hecho idóneo realizado en virtud de una norma vigente que le garantizara plenamente y en forma absoluta el derecho a retener su empleo. Tampoco le es apli-cable, como lo fue en el caso de las escoltas de los ex gober-nadores, la doctrina de “re-enactment”. Ello es así, ya que tanto la Ley del Sistema de Administración de los Recursos Humanos, Ley Núm. 184 de 3 de agosto de 2004, como la jurisprudencia de este Foro, reconocen la posibilidad de que un empleado público sea cesanteado si se dan ciertas condi-ciones y se cumple determinado procedimiento.
Primeramente, es menester aclarar que la Ley del Sis-tema de Administración de los Recursos Humanos define empleados de carrera como “aquellos que han ingresado al servicio público en cumplimiento cabal de lo establecido por el ordenamiento jurídico vigente y aplicable a los pro-cesos de reclutamiento y selección del servicio de carrera al momento de su nombramiento. Tales empleados tienen de-recho a permanecer en el servicio conforme se dispone en la [Sección 6.6 de esta Ley]”. (Enfasis suplido.)(83) No obs-tante, la referida sección también señala lo siguiente:
*434 9. Se podrán decretar cesantías en el servicio, sin que cons-tituya acción disciplinaria o destitución, en las siguientes cir-cunstancias:
a. [D]ebido a la eliminación de puestos por falta de trabajo o de fondos. En estos casos, las cesantías se decretarán dentro de los grupos de empleados cuyos puestos tengan el mismo título de clasificación y considerando dentro de cada grupo el status de los empleados, su productividad, hábitos y actitudes reflejadas en sus evaluaciones y su antigüedad en el servicio.
A los fines de determinar antigüedad, se considerará todo ser-vicio prestado en puestos de las agencias comprendidas en el Sistema. La Autoridad Nominadora de cada agencia notificará por escrito a todo empleado a quien haya de cesantear con no menos de treinta (30) días de antelación a la fecha en que habrá de quedar cesante. Ninguna cesantía de empleados será efectiva a menos que se cumpla con el requisito de notificación. Cada agencia procederá a establecer un procedi-miento escrito a los efectos de decretar cesantías en caso de éstas ser necesarias, el mismo será divulgado o estará dispo-nible para conocimiento de cualquier empleado interesado. (Énfasis suplido.)(84)
Como vemos, la propia ley previamente aprobada antes del estado de emergencia decretado legislativamente, per-mitía que al empleado regular de carrera se le privara del interés propietario que tiene sobre su puesto, siempre y cuando se realizara mediante un debido proceso de ley. En la medida en que el estatuto que concede el interés propie-tario también proveía para privarlo a causa de la falta de fondos para retribuirlo, ¿cómo podría entonces argumen-tarse que estos empleados poseen un derecho adquirido protegido constitucionalmente frente a cualquier gestión gubernamental que pretende intervenirlo?(85) Es precisa-mente esta realidad estatutaria la que nos conduce a con-cluir, como señalamos en la opinión mayoritaria, que en el presente caso “se encuentra ausente el elemento del amparo de una ley anterior que hubiese concedido tal derecho”. (En-fasis suplido y en el original. )(86) Recuérdese que “el dere- *435 cho adquirido no puede ser el conjunto de facultades que la ley anterior permitía que los ciudadanos ejercitaran, ya que esto sería el estado de derecho objetivo que la nueva ley intenta cambiar”.(87)
Los Jueces disidentes pretenden y sostienen, en el pre-sente caso, que es función de este Tribunal someter a revi-sión judicial la formulación de política pública de la Legis-latura de intervenir con las leyes previamente aprobadas y afectadas por la Ley Núm. 7, al declarar un estado de emer-gencia fiscal. Para ello, entienden que es necesario e im-prescindible que se pase prueba ante el Tribunal de Pri-mera Instancia sobre la crisis fiscal de la Rama Ejecutiva, la determinación legislativa sobre la emergencia fiscal de la Rama Ejecutiva y sobre las diferentes y variadas opcio-nes que dispuso la Asamblea Legislativa para conjurarlas. Lo anterior, es improcedente y, además, es INCONSE-CUENTE con lo actuado por este Tribunal en el pasado en los casos previamente mencionados y que tienen relación directa con el asunto ante nos.
Todo lo anterior contrasta claramente con la situación de los ex gobernadores, los cuales sí obtuvieron un derecho adquirido que no puede ser alterado retroactivamente por una ley aprobada después de su adquisición. Esos derechos “tienen ‘tal fuerza y autonomía’ derivada de la norma jurí-dica que los instituyó, que pueden oponerse con ‘toda la magnitud de su fuerza’ a cualquier intento de destruirlos o ignorarlos que provenga de una ley posterior”. (Citas omitidas. )(88)
Ahora bien, al Juez Presidente Señor Hernández Den-ton le resulta “sorprendente” la conclusión que alcanzamos en el caso de autos en cuanto a que los empleados públicos no gozan de un derecho adquirido sobre sus empleos, pues entiende que el ordenamiento jurídico relacionado con el *436 personal de servicio público le reconoce tal derecho. Nada más lejos de la verdad establecida por nuestro ordena-miento jurídico. Además, le parece “incomprensible” la dis-tinción que realizamos entre este caso y la decisión de re-conocerles a los ex gobernadores un derecho adquirido sobre sus escoltas policiacas. Para ello, se fundamenta en que “en el caso de las escoltas de los ex gobernadores no existía disposición legal alguna que expresamente les reco-nociera el derecho que reclamaban”. (Enfasis supri-mido.)(89)
Sin embargo, tal como precisamos en Hernández, Romero v. Pol. de P.R., supra, “los derechos adquiridos, sin importar su procedencia, ya sea mediante legislación, por contrato o por ‘derecho común’ gozan de la misma protec-ción que todo derecho constitucional”.(90) Lo importante es identificar si en efecto, el peticionario posee un derecho adquirido que se incorporó a su patrimonio al haber consu-mado el hecho que el estado de derecho vigente le proveía para que se configurara como tal.
En el caso de las escoltas de los ex gobernadores, el es-tado de derecho se concretó a raíz de la validez impartida por la Legislatura a la interpretación otorgada durante dé-cadas por la Policía a su propia ley orgánica, lo que provocó que esa interpretación administrativa de la Ley y el reco-nocimiento de la adquisición de un derecho adviniera a rango de norma vigente. Los ex gobernadores confiaron y se condujeron hacia la obtención del derecho de protección que ese estado de derecho les proveía, sin limitación alguna. Los ex mandatarios adquirieron tal derecho en vir-tud del hecho consumado contemplado por el ordenamiento jurídico, de sus respectivos retiros como primeros ejecuti-vos del País.
Con relación a todo lo anterior, es menester señalar que *437 aunque la situación económica y fiscal del País al momento de privarles las escoltas a los ex gobernadores era de déficit fiscal de la Rama Ejecutiva en su totalidad, surge clara-mente de los autos en Hernández, Romero v. Pol. de P.R., supra, que el pasado Superintendente, Lie. Pedro Toledo Dávila, reconoció que el gasto por el uso de escoltas era mínimo y su eliminación no representaría una economía significativa en los recursos económicos de la Policía de Puerto Rico, necesarios para prestar el servicio público lla-mado a ofrecer. La Policía de Puerto Rico no se encontraba en ese momento en un estado de emergencia fiscal decla-rado por la Legislatura. Esto contrasta significativamente con la situación de los empleados públicos aquí cesan-teados, pues, como señalamos en la opinión mayoritaria del caso de autos, sus cesantías representan un ahorro sustan-cial proyectado de por lo menos $510,000,000 al año, que de no producirse afectaría significativamente el servicio pú-blico llamado a prestarse por la Rama Ejecutiva en varia-das y sensitivas áreas del servicio público. La Rama Ejecu-tiva, en su totalidad, se encontraba, al momento de los despidos, en un estado de emergencia declarado por el Po-der Legislativo.
Los empleados públicos cesanteados poseían un interés propietario sobre sus empleos, pero el estado de derecho vigente no les otorgaba la posibilidad de consumar un he-cho que diese lugar a que la retención de ese empleo se conformara como un derecho adquirido que entrara a for-mar parte de su patrimonio. Ello es así, pues como hemos expresado, el propio ordenamiento jurídico provee para que, mediante un debido proceso de ley, “[se pueda] decre-tar cesantías en el servicio, sin que constituya acción disci-plinaria [o] destitución [en caso de] la eliminación de pues-tos por falta de trabajo o de fondos”. (Enfasis suplido.)(91) Y ello es precisamente lo que provocó la implantación del *438 plan de cesantías promulgado tras la aprobación de la Ley Níim. 7, la falta de fondos en las arcas del Gobierno para satisfacer la nómina y el salario de los miles de empleados que han sido cesanteados.
Sorprendentemente, para la Jueza Asociada Señora Fiol Matta el análisis que acabamos de realizar “no tiene fun-damento jurídico alguno”. (Énfasis suplido.)(92) La compa-ñera Jueza Asociada se pregunta: “¿Cómo es posible que de la interpretación de un artículo de la Ley de la Policía de Puerto Rico surja un derecho adquirido a escoltas, mien-tras que, ante la existencia de toda nuestra legislación la-boral y el contrato de trabajo individual, se argumenta que sólo surge un interés propietario, pero no un derecho ad-quirido?” (Énfasis suprimido.)(93)
Resulta que cuando la Asamblea Legislativa revisa al-guna ley y deja intactas algunas de las disposiciones de ésta que han sido interpretadas de determinada manera por la agencia llamada a su cumplimiento, y cuya interpre-tación es de conocimiento de la Legislatura, “los tribunales deberán determinar que la decisión de la Asamblea Legis-lativa fue de preservar y validar la interpretación brindada por la agencia correspondiente a tal disposición, como parte del estado de derecho vigente”.(94) De esta forma, esa interpretación adquiere rango de norma vigente, y como tal, capaz de convertir a particulares en titulares de dere-chos adquiridos.
A estos efectos, como muy bien expone la compañera Jueza Asociada Señora Fiol Matta citando a Santos Briz: “ ‘para que pueda hablarse de derechos adquiridos propia-mente tales es necesario que se trate de situaciones subje-tivas, cuya extensión y alcance son determinados por un *439 acto o negocio jurídico, no directamente por la ley, que se limita a hacer posible la conclusión de ese acto o nego-cio ...’ (Enfasis suplido.)(95) Es desde esta perspectiva que “es posible que de la interpretación de un artículo de la Ley de la Policía de Puerto Rico surja un derecho adquirido a escoltas” (énfasis suprimido)(96) pues los ex gobernadores comenzaron a hacer uso de éstas, de acuerdo con el estado de derecho vigente, al momento de consumarse y de ser efectivo el hecho de su retiro y por ende la activación de tal derecho.
Distinguible es la situación de los empleados públicos cesanteados. Como ya hemos demostrado, el estado de dere-cho vigente al momento de su contratación y antes de la declaración legislativa sobre estado de emergencia fiscal contemplaba la posibilidad de que éstos algún día fueran cesanteados a causa de la falta de trabajo o de fondos con los cuales remunerar su trabajo. En vista de que fue bajo esas condiciones que ingresaron al gobierno como empleados pú-blicos, no existe fundamento que permita concluir, de forma alguna, que estos empleados poseen un derecho adquirido sobre sus empleos. Ante la realidad de toda nuestra legisla-ción laboral y el contrato de trabajo individual, éstos sólo gozan de un interés propietario sobre sus puestos de tra-bajo, del cual se les puede privar mediante un debido pro-ceso de ley, atendida la situación de crisis y de emergencia fiscal de la Rama Ejecutiva y que afecta directa o indirecta-mente a cientos de miles de puertorriqueños.
*440 VI
A. Recurso de certificación intrajurisdiccional
Los tres jueces disidentes consideran que la mayoría ex-pidió el auto de certificación en el presente asunto en forma “apresurada”, sin permitir al Tribunal de Primera Instancia la construcción de un expediente judicial me-diante la celebración de una vista evidenciaría que le per-mitiera a las partes presentar prueba y esgrimir argumen-tos orales ante ese foro primario. Le imputan a la mayoría no haber evaluado el presente asunto con cuidado y que no fue analizado desde diferentes perspectivas. Sostienen que la mayoría expidió el referido auto prematuramente “para apresurarse a resolver el asunto constitucional”. La Jueza Asociada Señora Fiol Matta imputa a la mayoría que no cumplió con su función judicial de adjudicación en “forma mesurada y con justificación jurídica”, o sea, que la deci-sión de este Tribunal carece de juridicidad que la sostenga. Concluye que la mayoría circunvaló el trámite ordinario de los casos de epígrafe a pesar que de los expedientes de éstos ante nos solamente constaban la petición de certifi-cación, la demanda y los alegatos de las partes.
La distinguida Jueza Asociada Señora Fiol Matta trata de distinguir lo aquí señalado como improcedente de lo acaecido durante los meses de noviembre y diciembre de 2004, en los casos de Suárez v. C.E.E. I, supra, y Suárez v. C.E.E. II, supra.
B. Suárez v. C.E.E. I; Suárez v. C.E.E. II
El 2 de noviembre de 2004 se celebraron en Puerto Rico las elecciones generales. Tras el conteo inicial, la Comisión Estatal de Elecciones (C.E.E.), certificó preliminarmente como Gobernador electo al Lie. Aníbal Acevedo Vilá, candi-dato del Partido Popular Democrático (P.P.D.). En aras de certificar oficialmente a los candidatos electos en los pasa- *441 dos comicios electorales, el 12 de noviembre de 2004 la C.E.E. comenzó el escrutinio general.
Comenzado el referido procedimiento, el Comisionado Electoral del Partido Nuevo Progresista (P.N.P.) objetó la validez de todas aquellas papeletas en las cuales los elec-tores votaron bajo la insignia del Partido Independentista Puertorriqueño (P.I.P.), y a su vez brindaron un voto al Lie. Aníbal Acevedo Vilá, como candidato a Gobernador, y al Lie. Roberto Pratts Palerm, como candidato a Comisionado Residente. Ajuicio del Comisionado Electoral del P.N.P., en esas circunstancias dichos votos eran nulos por no haber forma de determinar la intención del elector. El Comisio-nado Electoral del P.P.D. se opuso a esa solicitud. Entendió que el voto impugnado se debía considerar como un voto mixto. El Presidente de la C.E.E. determinó que se trataba de una papeleta de voto mixto y que procedía adjudicarse como tal.
Posteriormente, el Sr. Manuel R. Suárez Jiménez y un grupo de electores que alegadamente emitieron el tipo de voto antes descrito acudieron ante el Tribunal de Primera Instancia, Sala Superior de San Juan, mediante una “Pe-tición de Sentencia Declaratoria e Xnjuction”, a pesar de que no fueron afectados por la decisión del Presidente de la C.E.E. sino, por el contrario, favorecidos por ella. Preten-dían, a través del referido procedimiento ante el foro pri-mario, que se decretara judicialmente la validez de su voto, remedio que ya le había concedido la C.E.E.
El Comisionado Electoral del P.N.P. solicitó al Tribunal de Primera Instancia la desestimación de la demanda por entender que ese tribunal no tenía jurisdicción por no exis-tir un “caso y controversia”, ya que los demandantes de autos no habían sido afectados por la decisión del Presi-dente de la C.E.E. sino favorecidos por ella. El foro prima-rio dictaminó en corte abierta declarando “con lugar” la solicitud de desestimación de la demanda. Posteriormente redujo a escrito su dictamen.
*442 Inconforme con la referida determinación del Tribunal de Primera Instancia, el señor Suárez Jiménez acudió ante este Tribunal mediante un recurso de certificación intrajurisdiccional. Adujo que el foro primario incidió al no concederle los remedios para garantizar el tipo de voto emitido por él y por aquellos electores que alegadamente emitieron su voto de la misma forma. Inmediatamente emitimos una resolución, acortando los términos regla-mentarios, para que las partes se expresaran en torno a si procedía nuestra intervención. Con el beneficio de la com-parecencia de las partes, sin legitimación activa de los de-mandantes de autos ante el Tribunal de Primera Instancia ni ante nos, sin jurisdicción de ambos foros por no haber un “caso y controversia justiciable”, de acuerdo con E.L.A. v. Aguayo, supra, sin un ápice de prueba presentada ante el foro primario, por no haberse celebrado vista evidenciaría alguna, y en ausencia de un expediente completo cons-truido por el foro primario, el 20 de noviembre de 2004 este Tribunal resolvió expedir el auto de certificación solicitado y simultáneamente dispuso de la totalidad del asunto. Este Tribunal decretó que era válido el voto emitido por los de-mandantes de autos en la papeleta estatal que contenía una cruz bajo una de las insignias de los partidos y una cruz en cada uno de los encasillados correspondientes a los candidatos a los puestos de Gobernador y de Comisionado Residente de otros partidos políticos. Concluimos, enton-ces, que resolver lo contrario implicaba contravenir el or-denamiento electoral de Puerto Rico en menoscabo del de-recho constitucional al sufragio. Ordenamos a la C.E.E., a su Presidente, a los Comisionados Electorales y a todos los funcionarios de esa dependencia gubernamental, a que contaran y adjudicaran como válidas todas las papeletas marcadas de esa forma por los electores, a pesar de que ya esa dependencia gubernamental había dispuesto de la misma forma previamente.
*443 El entonces Juez Asociado Señor Fuster Berlingeri emi-tió una opinión de conformidad. El 23 de noviembre de 2004 emitimos una opinión disidente con posterioridad a la certificación mayoritaria, pues el 20 de noviembre de 2004 se le concedió a los Jueces que no compartían el criterio mayoritario apenas tres horas para expresarse, a pesar del término reglamentario de treinta días para así hacerlo. La mayoría de entonces acortó el referido término reglamen-tario a tres horas a aquellos jueces que no compartían su criterio. La Jueza Asociada Señora Fiol Matta se queja que en el presente caso se redujo el mismo término a veinte y nueve días.
Nuestra opinión disidente giró fundamentalmente sobre el impedimento de este Tribunal de emitir su dictamen por falta de jurisdicción por haber sido presentado, ante nos, previo a su emisión, copia de un escrito de “Notice of Removal” presentado ante el Tribunal de Distrito de Estados Unidos para el Distrito de Puerto Rico con el propósito de trasladar ese caso ante el foro judicial primario federal, entre otros fundamentos. Añadimos, entonces, respecto a aquel asunto lo siguiente:
Este Tribunal, a pesar de su nombre (Tribunal Supremo), no tiene autoridad para imprimirle a sus facultades una dimen-sión que la Constitución de Puerto Rico no le ha otorgado. Tampoco puede arrogarse la jurisdicción del tribunal federal, de acuerdo con el ordenamiento estatutario federal. El Tribunal de Primera Instancia y este Tribunal sólo pueden emitir decisiones vinculantes para las partes que acuden ante ellos cuando se les presenta un “caso y controversia” y tienen juris-dicción para así hacerlo. Concluimos que el asunto ante nos no es justiciable bajo el Derecho puertorriqueño, porque los de-mandantes de autos, aquí peticionarios, no tienen legitima-ción activa para promover su pleito y no han presentado mi “caso y controversia” ante el Tribunal de Primera Instancia y este Tribunal. Este Tribunal carece de jurisdicción para actuar bajo el derecho estatutario federal y el derecho constitucional puertorriqueño. Concluimos, además, que los peticionarios pretenden de este Tribunal la emisión de una opinión consul- *444 tiva que les favorezca, a lo cual ha accedido la Mayoría en completo y absoluto menosprecio a los principios constitucio-nales puertorriqueños y de Estados Unidos, antes mencionados. La actuación altamente irregular y apresurada de la Mayoría en este asunto priva de legitimidad a este Tribunal, pues de acuerdo con el derecho estatutario federal y nuestro derecho constitucional, no resulta vinculante su deci-sión, además de restarle confiabilidad y credibilidad ante la ciudadanía. (Énfasis suprimido.)(97)
Los Jueces disidentes señalan que la mayoría del Tribunal llevó a cabo, en los casos de epígrafe, un trámite judicial apresurado que resulta contrario al debido proceso de ley. No compartimos tal criterio. No obstante, para esos Jueces no fue apresurado ni violatorio al debido proceso de ley el curso de acción y el trámite acelerado escogido por la entonces mayoría en Suárez v. C.E.E. I, supra, y Suárez v. C.E.E. II, supra, cuando estaba involucrado y se discutía el efecto práctico sobre la elección general celebrada el 2 de noviembre de 2004, del derecho fundamental al sufragio de cientos de miles de electores puertorriqueños.
La presente crisis fiscal no es nueva. Desde el 2005 este Tribunal ha tenido ante sí reclamos de la Rama Ejecutiva sobre la crisis fiscal y los compañeros Jueces que ahora disienten nunca cuestionaron la realidad ni la magnitud de ésta. Ahora, cuando la crisis fiscal está ampliamente docu-mentada y se han legislado varias medidas para conju-rarla, esos mismos Jueces consideran los hallazgos legisla-tivos como si fueran meras alegaciones y pretenden que un tribunal evalúe de novo la crisis y la necesidad de las me-didas fiscales tomadas por los funcionarios que el Pueblo eligió. En el presente caso no le imparten deferencia al-guna a ese proceso legislativo.
Ese no es el rol de los tribunales en nuestra democracia representativa. Los tribunales no pueden asumir el papel que legítimamente corresponde al proceso político. Si los jueces protagonizamos ese rol, el Pueblo pierde.
*445 Tomamos conocimiento judicial de los múltiples hallaz-gos legislativos que establecen la existencia de una pro-funda y muy seria crisis fiscal y presupuestaria que data de varios años. Partiendo de esa política pública legislada, analizamos la constitucionalidad de las medidas tomadas por el Gobierno que se impugnaron en los recursos conso-lidados de epígrafe.
Al convalidar desde el ángulo constitucional la Ley Núm. 7, no emitimos juicios valorativos sobre la sabiduría del estatuto. Tal asunto no nos corresponde. Como Jueces, nos limitamos al análisis constitucional de la controversia al amparo de las normas establecidas en el ordenamiento jurídico vigente. Nuestra guía ha sido, es y siempre será la honestidad intelectual y la coherencia jurídica.
— O —

 Presidente de la Cámara v. Gobernador, 167 D.P.R. 149, 151-152 (2006).

 íd., pág. 152.

 íd., pág. 153.

 íd., págs. 153-154.

 íd., pág. 155.

 íd., pág. 154.

 íd., págs. 155-156.

 íd., págs. 154-156.

 íd., pág. 156.

 íd., pág. 158.

 íd., pág. 159.

 íd., pág. 158.

 íd., pág. 161.

 íd.

 íd., págs. 161-162.

 íd., pág. 162.

 íd., pág. 165.

 Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1, 158 (2010), opinión disi-dente de la Juez Asociada Señora Rodríguez Rodríguez.

 íd., pág. 161.

 Díaz Saldaña v. Acevedo Vilá, 168 D.P.R. 359, 360 (2006).

 íd., pág. 360.

 íd.

 íd., págs. 360-361.

 íd., pág. 361.

 íd., pág. 362.

 Presidente de la Cámara v. Gobernador, supra.

 Díaz Saldaña v. Acevedo Vilá, supra.

 íd., págs. 362-363. Véanse, además: Ley para el Financiamiento del Déficit Gubernamental del 2006, Ley Núm. 90 de 13 de mayo de 2006; Ley del Fondo de Interés Apremiante, Ley Núm. 91 de 13 de mayo de 2006; Ley para la Imposición de Contribución Extraordinaria de 2006, Ley Núm. 98 de 16 de mayo de 2006; Ley para la Reforma Fiscal del Gobierno del Estado Libre Asociado de Puerto Rico de 2006, Ley Núm. 103 de 25 de mayo de 2006; Enmiendas a la Ley de Bonos del Gobierno, Ley Núm. 104 de 25 de mayo de 2006; Enmiendas a la Ley de la Oficina de Gerencia y Presupuesto, Ley Núm. 106 de 25 de mayo de 2006; Ley de Control de Gastos en la Nómina Gubernamental para la Reforma Fiscal del Gobierno de Puerto Rico del 2006, Ley Núm. Ill de 31 de mayo de 2006; Resolución Conjunta Núm. 119 de 13 de mayo de 2006 (R.C. de la C. 1485).

 íd, pág. 368.

 íd.

 íd.

 Véase Presidente de la Cámara v. Gobernador, supra, págs. 164-200.

 véase esc. 18.

 Domínguez Castro et al. v. E.L.A. I, supra, pág. 112, opinión disidente de la Jueza Asociada Señora Fiol Matta.

6) Díaz Saldaña v. Acevedo Vilá, supra, págs. 376-377.

 íd., pág. 377.

 íd.

 íd., págs. 385-386, citando a Dávila v. Superintendente de Elecciones, 82 D.P.R. 264 (1960).

 Díaz Saldaña v. Acevedo Vilá, supra, págs. 389-391.

 Id., pág. 401.

 Romero Barceló v. E.L.A., 169 D.P.R. 460, 463-467 (2006).

 íd., pág. 467.

 íd., págs. 467-468.

 íd., pág. 468.

 íd., pág. 469.

 íd.

 íd., pág. 498.

 íd., pág. 498.

 íd.

 íd.

 íd.

 Romero Barceló v. E.L.A., supra, pág. 481.

 íd., pág. 505.

 íd.

 íd., pág. 506, opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez.

 Díaz Saldaña v. Acevedo Vilá, supra, pág. 360.

 Domínguez Castro et al. v. E.L.A. I, supra, págs. 117-118, opinión disidente de la Jueza Asociada Señora Fiol Matta.

 íd., pág. 118.

 íd., pág. 118.

 íd., pág. 123.

 Id, pág. 112.

 íd., pág. 114.

 íd.

 íd., pág. 136.

 íd., pág. 118.

 íd., págs. 136-137.

 íd., pág. 156.

 íd., pág. 157.

 Domínguez Castro et al. v. E.L.A. I, supra, pág. 101, opinión disidente del Juez Presidente Señor Hernández Denton.

 íd.

 íd., págs. 101-102.

 íd., págs. 102 y 103.

 íd., pág. 109.

 Para una exposición sobre los poderes gubernamentales en situaciones de emergencia, véanse: 86 A.L.R. 1539; 96 A.L.R. 826 (base de datos actualizada y disponible en Westlaw, el 6 de febrero de 2010).

 Domínguez Castro et al. v. E.L.A. I, supra, pág. 104, opinión disidente del Juez Presidente Señor Hernández Denton.

 Domínguez Castro et al. v. E.L.A. I, supra, pág. 158, opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez, págs. 1-2.

 íd.

 íd.

 íd., págs. 158-159.

 íd., pág. 159.

 “No se podrá certificar ponencia alguna que no haya sido previamente cir-culada a todos(as) los(as) jueces por lo menos diez (10) días antes de ser certificada, a no ser que una mayoría así lo disponga o que por la naturaleza urgente del asunto se prescinda de dicho término, aunque no de la circulación.”

 Granados v. Rodríguez Estrada II, 124 D.P.R. 593, 614 esc. 6 (1989), traducido en Granados v. Rodríguez Estrada V, 127 D.P.R. 1, 7 (1990).

 Art. 9, Sec. 9.1 de la Ley para la Administración de los Recursos Humanos en el Servicio Público del Estado Libre Asociado de Puerto Rico, Ley Núm. 184 de 3 de agosto de 2004 (3 L.P.R.A. see. 1465).

 Art. 6, Sec. 6.6(9)(a), 3 L.P.R.A. sec. 1462e(9)(a).

 Véase Hernández, Romero v. Pol. de P.R., 177 D.P.R. 121 (2009).

 Domínguez Castro et al. v. E.L.A. I, supra, pág. 70.

 Consejo Titulares v. Williams Hospitality, 168 D.P.R. 101, 109 (2006).

 Asoc. Maestros v. Depto. Educación, 171 D.P.R. 640, 665 (2007), opinión disidente de la Jueza Asociada Señora Fiol Matta.

 Domínguez Castro et al. v. E.L.A. I, supra, pág. 108, opinión disidente del Juez Presidente Señor Hernández Denton.

 Hernández, Romero v. Pol. de P.R., supra, pág. 28.

 Art. 6, Sec. 6.6(9)(a) de la Ley para la Administración de los Recursos Hu-manos en el Servicio Público del Estado Libre Asociado de Puerto Rico, supra.

 Domínguez Castro et al. v. E.L.A. I, supra, pág. 129, opinión disidente de la Jueza Asociada Señora Fiol Matta.

 íd.

 Hernández, Romero v. Pol. de P.R., supra, pág. 142.

 Domínguez Castro et al. v. E.L.A. I, supra, pág. 126, opinión disidente de la Jueza Asociada Señora Fiol Matta.

 íd., pág. 129.

 Suárez v. C.E.E. II, supra, págs. 393-394.